## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| WILLIAM COX and MERRILL DILL, Derivatively on Behalf of Nominal Defendant, FIFTH THIRD BANCORP, <br><br> Plaintiffs, <br><br> vs. <br><br> GREG D. CARMICHAEL, TAYFUN TUZUN, FRANK FORREST, C. BRYAN DANIELS, THOMAS H. HARVEY, GARY R. HEMINGER, JEWELL D. HOOVER, EILEEN A. MALLESCH, MICHAEL B. MCCALLISTER, MARSHA C. WILLIAMS, NICHOLAS K. AKINS, B. EVAN BAYH III, JORGE L. BENITEZ, KATHERINE B. BLACKBURN, EMERSON L. BRUMBACK, and JERRY W. BURRIS, <br><br> Defendants, <br><br> and <br><br> FIFTH THIRD BANCORP <br><br> Nominal Defendant. | CASE NO. |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs William Cox and Merrill Dill ("Plaintiffs"), by and through their undersigned attorneys, submit this Verified Shareholder Derivative Complaint (the "Complaint") against defendants named herein. Plaintiffs allege the following based upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, the investigation conducted by and under the supervision of their counsel which included, among other things: (a) a review and analysis of regulatory filings filed by Fifth Third Bancorp ("Fifth Third" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by Fifth Third; (c) a review of other publicly available information concerning Fifth Third, including articles in the news media and analyst reports; (d) a review of complaints and related materials in litigation commenced against some or all of the Individual Defendants (defined below) and/or the Company; and (e) applicable rules and regulations.

## SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought for the benefit of Nominal Defendant Fifth Third, a publicly traded company incorporated in Ohio, against current and former members of the Company's Board of Directors (the "Board") and certain of its current executive officers (collectively, the "Individual Defendants") for breach of fiduciary duty, unjust enrichment, and violation of Section 14(a) of the Securities and Exchange Act of 1934 (the "Exchange Act").

2.      On March 9, 2020, the Consumer Financial Protection Bureau ("CFPB") initiated a lawsuit in the United States District Court Northern District of Illinois Eastern Division against Fifth Third Bank, National Association ("Fifth Third Bank").[1]  The case is docketed as *Bureau of*

---

[1] Fifth Third is the indirect parent company of Fifth Third Bank.

*Consumer Financial Protection v. Fifth Third Bank, National Association*, Case Number 1:20-cv-01683 (the "CFPB Action").

3.     The CFPB Action alleges, *inter alia*, that Fifth Third Bank incentivized and conditioned employment on "ambitious sales goals" and rewarded employees for selling new products and/or services to existing Fifth Third customers.  The CFPB alleges that these sales goals led to employees opening unauthorized consumer-financial products and services (the "Unauthorized Accounts").

4.     The CFPB further contends that Fifth Third Bank was aware of these Unauthorized Accounts "since at least 2008"; however, the Company failed to implement and monitor its incentive program, failed to detect and stop misconduct, and further failed to identify and remediate harmed consumers.

5.     In addition to the CFPB Action, the Company and certain of the Company's executive officers are subject to a federal securities fraud class action lawsuit pending in the United States District Court Northern District of Illinois Eastern Division, docketed as *Heavy & General Laborers' Local 472 & 172 Pension and Annuity Funds et al.  v. Fifth Third Bancorp, Greg D. Carmichael, and Tayun Tuzun,* Case Number: 1:20-cv-02176 (N.D. Ill. Apr. 07, 2020) (the "Securities Class Action").  The Company is also subject to Consumer Class Actions (defined below).

6.     The allegations of the Securities Class Action are similar to those contained within the CFPB Action.  Additionally, the Securities Class Action alleges that the Company provided materially false and misleading statements to investors.

7.     Demand is futile in this case, as there does not exist a majority of Board members capable of disinterestedly and independently considering a demand.

8.     The Individual Defendants breached their duties of loyalty, care, and good faith by: (i) failing to implement and enforce a system of effective internal controls and procedures; (ii) failing to exercise their oversight duties by not monitoring the Company's compliance with state and federal laws and the Company's internal policies and procedures; (iii) consciously disregarding and failing to ensure that the Company was following proper sales practices, resulting in the commencement of the CFPB Action and the Securities Class Action; (iv) failing to fully, fairly, and timely disclose the scope and impact of the improper sales practices taught to and used by the Company's employees and managers; (v) failing to timely take corrective action to reduce and/or eliminate the illegal sales practices taught to and used by the Company's employees and managers; (vi) failing to revise the Company's incentive pay structure to reduce the likelihood of employees and managers engaging in unlawful sales practices; (vii) making and/or causing the Company to make false and misleading statements and/or material omissions resulting in the commencement of the Securities Class Action; (viii) allowing the Company to violate multiple federal and state laws and regulations; (ix) failing to take appropriate remedial action when the Board knew, or should have known, that there was pervasive misconduct at the Company; (x) failing to act in the best interests of the Company and instead acting for their own self-interest; and (xi) consciously causing substantial damage to the Company's credibility, corporate image, and goodwill.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over each defendant named herein.

10.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act.

11.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

12.     Fifth Third is a corporation that conducts business and maintains offices in this District.  The Individual Defendants have sufficient minimum contacts with Illinois and this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

13.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Venue is proper in this Court because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

14.     Plaintiff William Cox is currently and has continuously been a stockholder of Fifth Third since January 20, 2009.  Plaintiff is a citizen of the state of Florida.

15.     Plaintiff Merrill Dill is currently and has continuously been a stockholder of Fifth Third since July 1, 2012.  Plaintiff is a citizen of the state of Pennsylvania.

16.     Nominal Defendant Fifth Third is incorporated under the laws of Ohio and maintains its headquarters in Cincinnati, Ohio.  The Company was founded in 1858 and currently operates as a diversified financial services company within the United States.  As of June 30, 2019, the Company operated 1,207 full-service banking centers and 2,551 ATMs in Ohio, Kentucky, Indiana, Michigan, Illinois, Florida, Tennessee, West Virginia, Georgia, and North Carolina.  Fifth Third is a bank holding company.  Fifth Third indirectly holds Fifth Third Bank (defined above). The Company's securities trade on NASDAQ under the ticker symbol "FITB".

*Greg D. Carmichael*

17.     Defendant Greg D. Carmichael ("Carmichael") is the Company's Chairman, Chief Executive Officer ("CEO"), and President.  Carmichael was elected Chairman in 2018, and has served as CEO since November 2015 and President since September 2012.  From June 2006 to September 2012, Carmichael served as the Company's Chief Operating Officer ("COO") and Chief Information Officer ("CIO") from June 2003 to June 2006.  Carmichael has served as a director of the Company since 2015.

18.     According to the Company's DEF 14A Proxy Statement filed on March 4, 2020 (the "2020 Proxy Statement"), as of December 31, 2019, Carmichael beneficially owns 1,336,633 shares of the Company's common stock.

19.     According to the Company's 2020 Proxy Statement, in 2019 Carmichael received total compensation of $8,999,237.  This included $1,100,070 in salary, $4,462,507 in stock awards, $787,498 in option awards, $2,200,000 in non-equity incentive plan compensation, and $449,162 in other compensation.

20.     According to the Company's 2020 Proxy Statement, in 2018 Carmichael received total compensation of $11,173,652.  This included $1,088,531 in salary, $4,887,480 in stock awards, $862,496 in option awards, $4,100,000 in non-equity incentive plan compensation, and $235,145 in other compensation.

21.     According to the Company's 2020 Proxy Statement, in 2017 Carmichael received total compensation of $8,688,292.  This included $1,000,064 in salary, $4,526,248 in stock awards, $798,750 in option awards, $2,000,000 in non-equity incentive plan compensation, and $363,230 in other compensation.

22. According to the Company's 2020 Proxy Statement, the Company's Compensation Committee has granted Carmichael the benefit of personal use of the corporate aircraft "up to a maximum value of $100,000 per year."

23. Carmichael's corporate biography listed on the Company's website states the following regarding Defendant Carmichael:

> Greg D. Carmichael serves as chairman, president and chief executive officer of Fifth Third Bancorp, the ninth-largest U.S.-based consumer bank. Since Greg became CEO, the Company has grown in assets to $185 billion* and is recognized as one of the most innovative banks in the country. It has approximately 20,000 employees and about 1,123 banking centers across 10 states. Its four main businesses are Commercial Banking, Branch Banking, Consumer Lending and Wealth & Asset Management. The Bank has commercial and consumer lending presence across the United States.

> In more than 16 years of service to the Company, Greg has provided outstanding direction and vision, and his leadership has helped drive the Bank's transformation and overall success. Greg joined Fifth Third Bank in June 2003 as executive vice president and chief information officer. He was named chief operating officer in 2006, then president in September 2012. He was appointed to the Board of Directors in July 2015, became CEO in November 2015 and was elected chairman of the Board in January 2018.

> Before coming to Fifth Third, Greg served for seven years as chief information officer for Emerson Electric, a worldwide provider of technology and energy solutions. His background also includes leadership roles in information technology with General Electric.

> Greg and his wife live in Cincinnati. They have three adult sons.

> **Education**

> Greg earned a bachelor's degree in computer science from the University of Dayton and a master's degree from Central Michigan University.

> **Professional and Civic**

> In January 2020, Greg joined the board of directors of Encompass Health. He also serves on the board of trustees of Bethesda Inc. and the boards of directors of the American Bankers Association, Cincinnati Business Committee and Ohio Business Roundtable Executive Committee. Greg is a member of the Bank Policy Institute's board and BITS, its digital policy forum, and he is president of the Commercial

Club of Cincinnati. In 2019, Greg was named to the American City Business Journals' "Influencers: Finance" list of 100 U.S. executives with the biggest impact on business.[2]

*Tayfun Tuzun*

24.     Defendant Tayfun Tuzun ("Tuzun") is the Company's Chief Financial Officer ("CFO") and Executive Vice President.  Previously, Tuzun served as the Company's Treasurer. Tuzun joined Fifth Third in 2007 as a structured finance manager.

25.     According to the Company's 2020 Proxy Statement, Tuzun beneficially owns 329,256 shares of the Company's common stock.

26.     According to the Company's 2020 Proxy Statement, in 2019 Tuzun received total compensation of $2,797,182.  This included $602,913 in salary, $1,215,493 in stock awards, $214,500 in option awards, $635,000 in non-equity incentive plan compensation, and $129,276 in other compensation.

27.     According to the Company's 2020 Proxy Statement, in 2018 Tuzun received total compensation of $3,022,286.  This included $586,015 in salary, $1,020,011 in stock awards, $180,000 in option awards, $1,150,000 in non-equity incentive plan compensation, and $86,260 in other compensation.

28.     According to the Company's 2020 Proxy Statement, in 2017 Tuzun received total compensation of $2,713,004.  This included $553,426 in salary, $1,190,006 in stock awards, $209,997 in option awards, $630,000 in non-equity incentive plan compensation, and $129,575 in other compensation.

29.     Tuzun's corporate biography listed on the Company's website states the following regarding Defendant Tuzun:

---

[2] https://www.53.com/content/dam/fifth-third/docs/bios/greg-carmichael-bio.pdf.

Tayfun Tuzun is executive vice president and chief financial officer, responsible for Finance, Treasury, Business Planning and Analysis, Corporate Tax, Investor Relations and Accounting for Fifth Third Bancorp.

He previously served as treasurer, overseeing funding and liquidity, capital management, asset liability and balance sheet management, among other roles. He was promoted to treasurer in 2011.

Tayfun joined Fifth Third in 2007 as a structured finance manager and later served as assistant treasurer.

Tayfun began his private-sector career at Provident Bank in Cincinnati as asset liability manager in 1993 and worked in various senior positions in treasury and finance at that bank. In 2004, upon the sale of Provident Bank to National City, he joined FSI Inc., a multiplatform hedge fund specializing in the financial services sector. Before joining Provident, he was a faculty member at the University of New South Wales in Sydney, Australia.

He and his wife live in Cincinnati with their two daughters.

### Education

Tayfun holds both a master's degree and a doctorate in economics from the Ohio State University and a bachelor's degree in economics from Bosphorus University in Istanbul, Turkey.

### Professional and Civic

Tayfun is a member of the Financial Services Roundtable and is on the board of directors of the Cincinnati Shakespeare Company.[3]

### *Frank Forrest*

30.     Defendant Frank Forrest ("Forrest") is the Company's Special Advisor to the Chief Executive Officer, as of January 2020.  For the six (6) years prior, Forrest served as the Company's Chief Risk Officer ("CRO").

31.     According to the Company's 2020 Proxy Statement, Forrest beneficially owns 130,083 shares of the Company's common stock.

---

[3] https://www.53.com/content/dam/fifth-third/docs/bios/tayfun-tuzun-bio.pdf.

32. According to the Company's 2020 Proxy Statement, in 2019 Forrest received total compensation of $2,495,628. This included $557,010 in salary, $1,020,011 in stock awards, $179,998 in option awards, $615,000 in non-equity incentive plan compensation, and $123,609 in other compensation.

33. According to the Company's 2020 Proxy Statement, in 2018 Forrest received total compensation of $2,894,579. This included $546,092 in salary, $1,020,011 in stock awards, $180,000 in option awards, $1,055,000 in non-equity incentive plan compensation, and $93,476 in other compensation.

34. According to the Company's 2020 Proxy Statement, in 2017 Forrest received total compensation of $2,683,044. This included $534,796 in salary, $1,190,006 in stock awards, $209,997 in option awards, $600,000 in non-equity incentive plan compensation, and $148,245 in other compensation.

35. Forrest's corporate biography listed on the Company's website states the following regarding Defendant Forrest:

> Frank Forrest is executive vice president and serves Fifth Third Bancorp as special advisor to the CEO for key regulatory matters. He moved to that role in January 2020 after serving more than six years as chief risk officer.
>
> In his previous role, Frank's responsibilities included development and implementation of a risk management framework, risk appetite, risk mitigation strategies and key measures across both the enterprise risk organization, as well as independent business control teams. Combined, these teams manage compliance, model, credit, market, strategic, liquidity, operational and reputational risk matters to support balanced, profitable growth.
>
> Before joining Fifth Third in September 2013, Frank held numerous positions in credit and risk management at Bank of America Merrill Lynch, including managing director for quality control for mortgage banking, global debt products executive and commercial banking risk management executive. Before joining Bank of America, Frank worked for eight years at the U.S. Department of the Treasury's Office of the Comptroller of the Currency as a national bank examiner.

**Education**

Frank earned a bachelor's degree in accounting and finance from Florida State University.

**Professional and Civic**

Frank served from 2010 to 2014 on the Wake Forest University College Board of Visitors. For more than 10 years, he served Providence Day School in Charlotte, North Carolina, on the board of advisors, board of trustees and, finally, as chairman of the board of trustees.[4]

***Bryan Daniels***

36.     Defendant C. Bryan Daniels ("Daniels") has served as a director of the Company since 2019.  Additionally, Daniels currently serves on the Company's Risk and Compliance Committee, as well as the Technology Committee.  Previously, Daniels served on the Company's Audit Committee.

37.     According to the Company's 2020 Proxy Statement, as of December 31, 2019, Daniels beneficially owned 236,931 shares of the Company's common stock.  According to a SEC Form 4 filed on April 16, 2020, Daniels currently holds 208,324.531 shares of the Company's common stock.

38.     According to the Company's 2020 Proxy statement in 2019 Daniels received compensation of $176,075.  This includes $42,500 in cash and $133,575 in stock awards.

39.     Daniels is affiliated as a managing member of the sole general partner of Prairie Capital IV, L.P. and Prairie Capital IV QP, L.P.  Daniels has a 2.31% ownership interest in Prairie Capital IV, L.P. and Prairie Capital IV QP, L.P.

40.     According to the Company's 2020 Proxy statement, Daniels is "Co-founder and principal of Prairie Capital, a Chicago-based private equity firm; Former Senior Vice President of

---

[4] https://www.53.com/content/dam/fifth-third/docs/bios/frank-forrest-bio.pdf.

Commercial Banking at National Bank and Trust Company; Former Director of MB Financial, Inc.; Former Director of Taylor Capital."

41.     Daniels corporate biography listed on Prairie Capital's website states the following regarding Defendant Daniels:

**FOUNDED PRAIRIE:**

1997

**EDUCATION:**
Wabash College
(BA in Mathematics and Chemistry, Magna Cum Laude)
University of Chicago
(MBA and MS in Computer Science)

**EXPERIENCE**

Bryan co-founded Prairie Capital in 1997 and currently serves as a Partner of the firm. Prior to Prairie, Bryan was a Senior Vice President of commercial banking at American National Bank & Trust Company, an $8 billion subsidiary of Bank One (now part of JP Morgan Chase). Overseeing more than $70 million in preferred stock investments in this division, he also served on the Investment Committee of ANB Mezzanine.

**OTHER**

Bryan sits on the Board of Directors for Fifth Third Bancorp. Bryan is also a Visiting Committee Member of the Physical Sciences Department at the University of Chicago, which fosters dialogue and creates links with the broader community. Bryan supports two Chicago Area schools that specialize in education for bright students with learning differences: 1) Wolcott, a college-prep high school, and 2) Hyde Park Day School, a first through eighth grade school. He lives with his wife and three children in Winnetka, IL.[5]

*Thomas H. Harvey*

42.     Defendant Thomas H. Harvey ("Harvey") has served as a director of the Company since 2019. Additionally, Harvey serves on the Company's Audit Committee, Nominating and Corporate Governance Committee, and Technology Committee. Previously, Harvey served on the

---

[5] https://www.prairie-capital.com/portfolio/bryan-daniels/.

Company's Risk and Compliance Committee.

43.     According to the Company's 2020 Proxy Statement, as of December 31, 2019, Harvey beneficially owned 178,418 shares of the Company's common stock.  According to a SEC Form 4 filed on April 16, 2020, Harvey beneficially owns 188,968.2 shares of the Company's common stock.

44.     According to the Company's 2020 Proxy Statement, in 2019 Harvey received total compensation of $176,075.  This included $42,500 in cash and $133,575 in stock awards.

45.     According to the Company's 2020 Proxy Statement Harvey is "Chief Executive Officer of Energy Innovation: Policy and Technology, LLC; Managing Partner and Principal Owner, Ajax LLC; Former Chairman of the Board of Directors of MB Financial, Inc.; Former CEO of ClimateWorks Foundation; Former Environment Program Director of the William and Flora Hewlett Foundation; Former President of Energy Foundation."

46.     The Company's 2020 Proxy Statement stated the following about Defendant Harvey:

> Mr. Harvey's qualifications for services as a director include 25 years of experience in the financial services industry. His experience in executive positions with multiple foundations and other organizations provides him with strong organizational and leadership skills and extensive investment experience and makes him particularly well-suited to serve on Fifth Third's Board of Directors. Mr. Harvey als rience with the emergence and growth of technology in the banking industry.

### Gary R. Heminger

47.     Defendant Gary R. Heminger ("Heminger") has served as a director of the Company since 2006.  Additionally, Heminger serves as chairman of the Finance Committee and also serves on the Human Capital and Compensation Committee, as well as the Risk and Compliance Committee.  Previously, Heminger served on the Nominating and Corporate Governance Committee.

48.     According to the Company's 2020 Proxy Statement, as of December 31, 2019, Heminger beneficially owned 52,934 shares of the Company's common stock. According to a SEC Form 4 filed on April 16, 2020, Heminger beneficially owns 76,502.203 shares of the Company's common stock.

49.     According to the Company's 2020 Proxy Statement, in 2019 Heminger received total compensation of $265,000. This included $140,000 in cash and $125,000 in stock awards.

50.     According to the Company's 2020 Proxy Statement, Heminger is "CEO and Chair of Marathon Petroleum Corporation; Chair and former CEO of MPLX GP LLC (the general partner of MPLX LP); MPLX LP is a consolidated master limited partnership formed by Marathon Petroleum Corporation; Director at PPG Industries, Inc."

51.     The Company's 2020 Proxy Statement stated the following about Defendant Heminger:

> Mr. Heminger's qualifications for service as a director include valuable business knowledge gained from his responsibilities in overseeing all operations, performance, reporting, and financial metrics for Marathon's refining, marketing, transportation, and Speedway business. He has financial experience through his oversight of all financial data, working capital, and merger and acquisition activity.
>
> *On October 31, 2019, Marathon Petroleum Corporation announced Mr. Heminger's plans to retire as Chairman and Chief Executive Officer of Marathon Petroleum Corporation and as Chairman of MPLX GP LLC to be effective at the conclusion of Marathon Petroleum Corporation's 2020 Annual Meeting scheduled for April 29, 2020. Mr. Heming for reelection to the Marathon Petroleum Corporation Board of Directors at the 2020 Annual Meeting.

### Jewell D. Hoover

52.     Defendant Jewell D. Hoover ("Hoover") has served as a director of the Company since 2009. Additionally, Hoover serves on the Company's Audit Committee, as well as the Risk and Compliance Committee. Previously, Hoover served as the chairwoman of the Company's

Risk and Compliance Committee and also previously served on the Company's Finance Committee.

53.     According to the Company's 2020 Proxy Statement, as of December 31, 2019, Hoover beneficially owned 44,876 shares of the Company's common stock. According to a SEC Form 4 filed on April 16, 2020, Hoover beneficially owns 57,976.925 shares of the Company's common stock.

54.     According to the Company's 2020 Proxy Statement, in 2019 Hoover received total compensation of $265,000. This included $140,000 in cash and $125,000 in stock awards.

55.     According to the Company's 2020 Proxy Statement, Hoover is a "Retired Senior Official with the Office of the Comptroller of the Currency; Author of the "Ultimate Guide for Bank Directors"; Former Director of First Charter Corporation; Principal with the bank consulting firm Hoover and Associates, LLC until 2014."

56.     The Company's 2020 Proxy Statement stated the following about Defendant Hoover:

> Ms. Hoover's qualifications for service as a director include 28 years of service with the Office of the Comptroller of the Currency, including service as the Deputy Comptroller of the agency's Western District. Ms. Hoover also has gained valuable banking experience and knowledge as a bank consultant for corporate governance, director training, and problem bank resolution matters. Additionally, she has first-hand knowledge of Fifth Third through her service as a director of its North Carolina affiliate and a predecessor banking organization. Ms. Hoover is also a National Association of Corporate Directors ("NACD") Board Leadership Fellow.

***Eileen A. Mallesch***

57.     Defendant Eileen A. Mallesch ("Mallesch") has served as a director of the Company since 2016. Additionally, Mallesch serves as the chairwoman of the Company's Audit Committee, and serves on the Finance Committee, Human Capital and Compensation Committee, and Risk and Compliance Committee.

58.     According to the Company's 2020 Proxy Statement, as of December 31, 2019, Mallesch beneficially owned 16,241 shares of the Company's common stock. According to a SEC Form 4 filed on April 16, 2020, Mallesch beneficially owns 23,541.47 shares of the Company's common stock.

59.     According to the Company's 2020 Proxy Statement, in 2019 Mallesch received total compensation of $220,000. This included $95,000 in cash and $125,000 in stock awards.

60.     According to the Company's 2020 Proxy Statement, Mallesch is a "Certified Public Accountant, Retired Senior Vice President & Chief Financial Officer of Nationwide Property & Casualty Segment, Nationwide Mutual Insurance Company; Former Senior Vice President & CFO for Genworth Financial Life Insurance/Service Co.; Currently serves on Board of Directors for Brighthouse Financial, Libbey, Inc., and State Auto Financial Corp., and previously served as Director for Bob Evans Farms, Inc."

61.     The Company's 2020 Proxy Statement stated the following about Defendant Mallesch:

> Ms. Mallesch's qualifications for service as a director include financial management experience from her roles as Chief Financial Officer for both Nationwide Mutual Insurance Company and Genworth Financial Life Insurance/Service Co. She has more than 25 years of broad finance and strategy experience in a variety of industries, ranging from insurance and telecommunications to consumer products and manufacturing. In addition, Ms. Mallesch brings vast knowledge in enterprise resource planning and large-scale technology integrations, strategic planning, and managing acquisitions, divestitures, and risk and compliance management. Ms. Mallesch is also a National Association of Corporate Directors ("NACD") Governance Fellow.

### Michael B. McCallister

62.     Defendant Michael B. McCallister ("McCallister") has served as a director of the Company since 2011. Additionally, McCallister serves as chairman of the Human Capital and Compensation Committee, and also serves on the Finance Committee and the Audit Committee.

63.     According to the Company's 2020 Proxy Statement, as of December 31, 2019, McCallister beneficially owned 48,025 shares of the Company's common stock.  According to a SEC Form 4 filed on April 16, 2020, McCallister beneficially owns 59,566.826 shares of the Company's common stock.

64.     According to the Company's 2020 Proxy Statement, in 2019 McCallister received total compensation of $235,000.  This included $110,000 in cash and $125,000 in stock awards.

65.     According to the Company's 2020 Proxy Statement, McCallister is "Retired Chair of the Board of Directors of Humana, Inc.; Previous Chief Executive Officer of Humana Inc. from February 2000 to December 2012; Humana board member in February 2000 and Chair of the Board from August 2010 until December 2013; Mr. McCallister joined Humana in June 1974; Current Director of AT&T Inc. and of Zoetis Inc."

66.     The Company's 2020 Proxy Statement stated the following about Defendant McCallister:

> Mr. McCallister's qualifications for service as a director include 39 years of experience in the health care sector at Humana, Inc. combined with an intimate knowledge of Humana's operational, financial, and strategic development. Beyond Humana, Mr. McCallister plays a leadership role in key business advocacy organizations. He served on the board of the Business Roundtable and is the past chair of the organization's Health and Retirement Task Force.

***Marsha C. Williams***

67.     Defendant Marsha C. Williams ("Williams") has served as a director of the Company since 2008.  Additionally, Williams serves on the Company's Finance Committee, Human Capital and Compensation Committee, and Nominating and Corporate Governance Committee.  Previously, Williams served on the Company's Audit Committee, as well as the Risk and Compliance Committee.

68.     According to the Company's 2020 Proxy Statement, as of December 31, 2019, Williams beneficially owned 64,550 shares of the Company's common stock. According to a SEC Form 4 filed on April 16, 2020, Williams beneficially owns 77,508.939 shares of the Company's common stock.

69.     According to the Company's 2020 Proxy Statement, in 2019 Williams received total compensation of $300,000. This included $150,000 in cash and $150,000 in stock awards.

70.     According to the Company's 2020 Proxy Statement, Williams is a "Retired Senior Vice President & Chief Financial Officer of Orbitz Worldwide, Inc from July 2007 to December 2010; Executive Vice President & Chief Financial officer of Equity Office Properties Trust from 2002 to 2007; Director of McDermott International, Inc.; Lead Independent Director of Modine Manufacturing Company; Director of the Davis Funds; former Supervisory Director of Chicago Bridge & Iron Company N.V.. which merged into McDermott International, Inc. in 2018."

71.     The Company's 2020 Proxy Statement stated the following about Defendant Williams:

> Ms. Williams's qualifications for service as a director include her extensive experience in financial matters including 42 years in finance and her service as the Chief Financial Officer of Orbitz and Equity Office Properties Trust as well as her service on the board of directors of other publicly traded corporations and mutual funds. Ms. Williams also possesses knowledge and experience in the financial services industry gained through her 15 years of service with other banking organizations.

### Nicholas K. Akins

72.     Defendant Nicholas K. Akins ("Akins") has served as a director of the Company since 2013. Additionally, Akins serves as the chairman of the Company's Nominating and Corporate Governance Committee and is a member of the Company's Finance Committee and Technology Committee. Previously, Akins served on the Company's Human Capital and Compensation Committee.

73.     According to the Company's 2020 Proxy Statement, as of December 31, 2019, Akins beneficially owned 31,455 shares of the Company's common stock.  According to a SEC Form 4 filed on April 16, 2020, Akins beneficially owns 38,494.826 shares of the Company's common stock.

74.     According to the Company's 2020 Proxy Statement, in 2019 Akins received total compensation of $230,000.  This included $105,000 in cash and $125,000 in stock awards.

75.     According to the Company's 2020 Proxy Statement, Akins is "Chair, President, & Chief Executive Officer of American Electric Power Company."

76.     The Company's 2020 Proxy Statement stated the following about Defendant Akin:

> Mr. Akins' qualifications for service as a director include business expertise as the Chief Executive Officer of a large, multi- state electric utility where he focuses on local operating utilities, community involvement, government relations, and regulations at the state, local, and federal levels. Mr. Akins has experience in all facets of operational, financial, and compliance-related activities in a heavily regulated business and industry. He also has experience overseeing cyber-related activities in business systems and critical infrastructure.

### B. Evan Bayh III

77.     Defendant B. Evan Bayh III ("Bayh") has served as a director of the Company since 2011. Additionally, Bayh serves on the Company's Nominating and Corporate Governance Committee, as well as the Company's Technology Committee.  Previously, Bayh served on the Company's Risk and Compliance Committee.

78.     According to the Company's 2020 Proxy Statement, as of December 31, 2019, Bayh beneficially owns 23,981 shares of the Company's common stock.

79.     According to the Company's 2020 Proxy Statement, in 2019 Bayh received total compensation of $220,000.  This included $95,000 in cash and $125,000 in stock awards.

80.     According to the Company's 2020 Proxy Statement, Bayh is "Senior Advisor to the private equity firm, Apollo Global Management; Board of Directors for Marathon Petroleum

Corporation, Berry Global Group, Inc., and RLJ Lodging Trust. Previously, Mr. Bayh served as Governor of Indiana, as a United States Senator, and as a Partner with the law firms McGuireWoods LLP and Cozen O'Connor."

81.    The Company's 2020 Proxy Statement stated the following about Defendant Bayh:

Mr. Bayh's qualifications for service as a director include two decades of experience in government service. First as Governor of Indiana and then in the United States Senate, Mr. Bayh dealt with a variety of financial, economic, and policy issues that impact a wide variety of businesses. He had supervisory authority over thousands of employees and oversaw a budget in excess of $10 billion. As a member of the Senate Banking Committee and Chair of the International Trade and Finance Subcommittee, Mr. Bayh gained perspective on issues of particular relevance to Fifth Third Bancorp. He also has extensive knowledge of cybersecurity issues as e Committee and Central Intelligence Agency External Advisory Board.

***Jorge L. Benitez***

82.    Defendant Jorge L. Benitez ("Benitez") has served as a director of the Company since 2015. Additionally, Benitez is the chairman of the Company's Technology Committee and serves on the Company's Finance Committee and Nominating and Corporate Governance Committee. Previously, Benitez served on the Company's Audit Committee, as well as the Risk and Compliance Committee.

83.    According to the Company's 2020 Proxy Statement, as of December 31, 2019, Benitez beneficially owned 19,276 shares of the Company's common stock. According to a SEC Form 4 filed on April 16, 2020, Benitez beneficially owns 26,856 shares of the Company's common stock.

84.    According to the Company's 2020 Proxy Statement, in 2019 Benitez received total compensation of $230,000. This included $105,000 in cash and $125,000 in stock awards.

85.    According to the Company's 2020 Proxy Statement, Benitez is a "Retired Chief Executive Officer of North America of Accenture; Director of World Fuel Services Corporation.

Previously, from September 2006 to August 2011, Mr. Benitez served as Chief Operating Officer of Accenture's Products Operating Group."

86.     The Company's 2020 Proxy Statement stated the following about Defendant Benitez:

> Mr. Benitez's qualifications for service as a director include extensive experience developing and executing business strategies across a range of industries, particularly consumer products and travel and transportation services. He also has significant experience implementing large-sale systems integration programs, as well as experience running operating units within a large multinational publicly-traded corporation.

### Katherine B. Blackburn

87.     Defendant Katherine B. Blackburn ("Blackburn") has served as a director of the Company since 2014.  Additionally, Blackburn serves on the Company's Audit Committee and the Nominating and Corporate Governance Committee.  Previously, Blackburn served on the Company's Risk and Compliance Committee.

88.     According to the Company's 2020 Proxy Statement, as of December 31, 2019, Blackburn beneficially owned 45,807 shares of the Company's common stock.  According to a SEC Form 4 filed on April 16, 2020, Blackburn beneficially owns 111,734.12 shares of the Company's common stock.

89.     According to the 2020 Proxy Statement, in 2019 Blackburn received total compensation of $220,000.  This included $95,000 in cash and $125,000 in stock awards.

90.     According to the Company's 2020 Proxy Statement, Blackburn is "Executive Vice President of the Cincinnati Bengals, Inc."

91.     As disclosed in the Company's 2020 Proxy Statement:

> One of our directors, Katherine B. Blackburn, is the Executive Vice President of the Cincinnati Bengals professional football team. She and members of her immediate family own substantially all of the equity interests in the parent company of the Cincinnati Bengals. During 2019, we paid the Cincinnati Bengals

approximately $1.8 million for sponsorship arrangements, tickets, and advertising expenses. Prior to Ms. Blackburn's appointment to the Board in September 2014, Fifth Third and the Cincinnati Bengals signed a five-year contract extension for these arrangements that calls for total payments by Fifth Third Bancorp during that period of over $7.9 million. By virtue of Ms. Blackburn's being an executive officer and a principal owner is deemed to be a related party having a direct material interest in these arrangements.

92.     The Company's 2020 Proxy Statement stated the following about Defendant Blackburn:

> Ms. Blackburn's qualifications for service as a director include business experience in running operations for the Cincinnati Bengals professional football franchise. She has extensive experience with human resource and personnel matters, cost and efficiency management, and business negotiations. Ms. Blackburn also has extensive experience with management of diversity and inclusion initiatives for large organizations through her role on the National Football League's Diversity Committee. Additionally, Ms. Blackburn holds a law degree and brings to the Board knowledge and familiarity of Fifth Third and the City of Cincinnati.

### Emerson L. Brumback

93.     Defendant Emerson L. Brumback ("Brumback") has served as a director of the Company since 2009.  Additionally, Brumback serves as the chairman of the Company's Risk and Compliance Committee, and serves on the Company's Finance Committee and the Human Capital and Compensation Committee.   Previously, Brumback served as the chairman of the Audit Committee and served on the Company's Finance Committee.

94.     According to the Company's 2020 Proxy Statement, as of December 31, 2019, Brumback beneficially owned 55,981 shares of the Company's common stock.  According to a SEC Form 4 filed on April 16, 2020, Brumback beneficially owns 66,471 shares of the Company's common stock.

95.     According to the Company's 2020 Proxy Statement, in 2019 Brumback received total compensation of $255,000.  This included $130,000 in cash and $125,000 in stock awards.

96.     According to the Company's 2020 Proxy Statement, Brumback is a "Retired President & Chief Operating Officer of M&T Bank; Former Director of M&T Bank Corporation; Vice Chair of the Board of the Ascendium Education Group."

97.     The Company's DEF 14A Proxy Statement filed on March 6, 2019 (the "2019 Proxy Statement") stated the following about Defendant Russell:

> Mr. Brumback's qualifications for service as a director include banking expertise through his 30 years of experience in the financial services industry with several banking organizations. He has gained valuable insight through his experience in executive positions overseeing many aspects of the banking field, including retail banking, commercial banking, banking operations, and systems. Mr. Brumback also brings his experience as a former board member with another financial services company.

### Jerry W. Burris

98.     Defendant Jerry W. Burris ("Burris") served as a director of the Company from 2016 until resigning in June 2020. Additionally, Burris previously served on the Company's Audit Committee and the Company's Risk and Compliance Committee.

99.     According to the Company's 2020 Proxy Statement, as of December 31, 2019, Burris beneficially owns 10,670 shares of the Company's common stock.

100.     According to the Company's 2020 Proxy Statement, in 2019 Burris received total compensation of $130,000. This included $105,000 in cash and $125,000 in stock awards.

101.     According to the Company's 2020 Proxy Statement, Burris is "President and Chief Executive Officer of Midwest Can & Container Specialties Company; Former President & Chief Executive Officer of Associated Materials Group, Inc.; Previous Division President of General Electric; Current Director of nVent PLC and former Director of Pentair PLC."

102.     On June 16, 2020, Fifth Third filed a Current Report on Form 8-K with the SEC (the "June 2020 8-K"). The June 2020 8-K stated, in relevant part:

On June 15, 2020, Jerry W. Burris notified the Board of Directors (the "Board") of Fifth Third Bancorp (the "Company") of his resignation as a director of the Company. Mr. Burris' resignation was due to scheduling conflicts with Board meeting dates that have arisen in relation to his expanding responsibilities as the Chief Executive Officer of Midwest Can Company and was not the result of any dispute or disagreement with the Company on any matter relating to its operations, policies, or practices.

103.    The Company's 2020 Proxy Statement stated the following about Defendant Burris:

> Mr. Burris' qualifications for service as a director include management expertise as the President and Chief Executive Officer of Associated Materials and as a division president with General Electric. Mr. Burris's expertise includes strong technical marketing skills, a sound understanding of how to best integrate technology, rapid innovation, mergers and acquisitions, and cost and efficiency management. He also brings experience from his service on a public company board's compensation and governance and audit committees.

104.    The Company's current Board is comprised of fifteen (15) directors: Defendants Carmichael, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, Akins, Bayh, Benitez, Blackburn, and Brumback, and non-parties Mitchell S. Feiger ("Feiger") and Linda W. Clement-Holmes ("Clement-Holmes").

105.    Defendants Carmichael, Tuzun, Forrest, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, Akins, Bayh, Benitez, Blackburn, Brumback, and Burris are sometimes collectively referred to herein as the "Individual Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

106.    By reason of their positions as officers, directors, and/or fiduciaries of Fifth Third and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Fifth Third and its shareholders fiduciary obligations of loyalty, care and good faith, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are

required to act in furtherance of the best interests of Fifth Third and its shareholders to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

107.    Each director and officer of the Company owes to Fifth Third and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company's affairs and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

108.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Fifth Third, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of various public statements issued by the Company.  Due to their positions with Fifth Third, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

109.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Fifth Third were required to, among other things:

        a.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner to make it possible to provide the highest quality performance of their business;

        b.    Exercise good faith to ensure that the Company was operating in a diligent, honest and prudent manner and complied with all applicable federal, state and foreign laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

    c.      Exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits, or other financial information concerning the financial condition of the Company;

    d.      Refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

    e.      When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

110.    Moreover, Fifth Third's board of directors adopted a Code of Business Conduct and Ethics ("Code"). The Code "applies to all officers, directors, employees and contractors of Fifth Third Bancorp, our subsidiaries and our affiliates. Anyone who violates the spirit or letter of the Code may face disciplinary action, up to and including termination."

111.    The Code identifies Fifth Third's Core Values Test and instructs officers, directors, employees, and contractors to ask the questions listed below if uncertainty arises regarding a certain action:

1.    Is the action legal?
2.    Does it comply with our Code of Business Conduct & Ethics and related policies?
3.    Does it reflect our core values?
4.    Would I be comfortable if I read about it in the news?
5.    Would it be ok if my manager or other employees did it?
6.    Would it keep Fifth Third and our shareholders from experiencing loss, harm, or unnecessary risk?
7.    Does it feel like the right thing to do?

112.     The Code further states, in relevant part:

Fifth Third Bancorp is committed to minimizing the impact of internal and external fraud to both Fifth Third and our customers. **Every employee at every level of the Bancorp is accountable and expected to do their part to protect Fifth Third and our customers from fraudulent activity.** There is zero tolerance for internal fraud within Fifth Third's organization and internal fraudulent activity must be referred to Bank Protection when suspected. **Failure to report fraudulent activity exposes Fifth Third to regulatory and compliance violations and could lead to significant financial penalties and additional fraud losses.**

(Emphasis added).

113.     The Company also has an Audit Committee, a Human Capital and Compensation Committee, a Finance Committee, a Nominating and Corporate Governance Committee, a Risk and Compliance Committee, and a Technology Committee.  Each committee has a respective charter to govern the committee members' duties and responsibilities.

114.     The Audit Committee serves in this role for both Fifth Third and Fifth Third Bank.

115.     The Audit Committee Charter states the following, in part:

The Committee's primary purposes are to:

- Oversee the accounting and financial reporting processes of the Corporation and the audits of the financial statements of the Corporation.

- Provide assistance to the Corporation's Board by monitoring:

  1.     the integrity of the financial statements of the Corporation,
  2.     the independent auditors' qualifications and independence,
  3.     the performance of the Corporation's and its subsidiaries' internal audit function and independent auditors,
  4.     the Corporation's system of internal controls, and
  5.     the Corporation's financial reporting and system of disclosure controls.

- Provide assistance to the Bank's Board by monitoring:

  1.     the integrity of the financial statements of the Bank,
  2.     the Bank's system of internal controls,
  3.     the Bank's financial reporting, and

4.  the compliance by the Bank with applicable legal and regulatory requirements

- Prepare the Committee report required by the rules of the SEC to be included in the Corporation's annual proxy statement

*    *    *

D. Bank Financial Reporting / Internal Controls

- Review, discuss with management (and, if deemed necessary, the internal and external auditors) and approve the Bank's financial statements, any reports required by the Bank's State of incorporation, and the Bank's representations made to the Corporation regarding the same.

- Discuss with management (and, if deemed necessary, the internal and external auditors) significant financial reporting issues and significant accounting policies and judgments made in connection with the preparation of the Bank's financial statements and call reports, including any significant changes in the Bank's selection or application of accounting principles.

- Discuss with management and the internal auditors the effect of regulatory and accounting initiatives and off-balance sheet transactions on the Bank's financial statements and any necessary disclosures related thereto.

- Review all material written communication between the independent auditors and Bank management.

- **Discuss with the Bank's internal auditors and management their assessments of the adequacy of the Bank's internal controls, including an assessment of whether management is diligently resolving any internal control weaknesses.**

- Review with management and the independent auditors the basis for the reports, if any, required to be filed by management and by the independent auditors with the FDIC pursuant to 12 C.F.R. Sections 363.2 (a) and (b) and Sections 363.3 (a) and (b), respectively.

- **Discuss with the Bank's internal auditors and management any weaknesses or deficiencies that any of the foregoing have identified relating to financial reporting, internal controls or other related matters and management's proposals for rectifying such weaknesses or deficiencies, including the prevention or detection of management override or compromise of the internal control system.**

- Monitor the Bank's progress in promptly addressing and correcting any and all identified weaknesses or deficiencies in financial reporting, internal controls or related matters.

- Discuss with management, the Risk and Compliance Joint Committee and the internal auditors the Bank's compliance with applicable laws and regulations and from time to time advise the Bank's Board of Directors with respect to the same.

- Work with the Risk and Compliance Joint Committee to ensure that any and all audit related deficiencies identified in any audit, Supervisory Issue or Order are properly addressed and that the Audit Committee is informed of management's progress in responding to any audit, Supervisory Issue or Order.

*      *      *

H. Compliance Oversight

- Review procedures designed to identify related party transactions that are material to the financial statements or otherwise require disclosure.

- Establish procedures and require the Corporation to obtain or provide the necessary resources and mechanisms for (i) the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.

- **Discuss with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints or published reports which raise material issues regarding the Corporation's financial statements or accounting policies.**

- Discuss with the Corporation's General Counsel and Chief Risk Officer legal matters that may have a material impact on the financial statements and that may have an impact on the Corporation's compliance policies.

- **Oversee the administration of the Corporation's Code of Business Conduct and establish an enforcement mechanism for the Corporation's Code of Business Conduct and Ethics.**

- Consider any material waivers of the Corporation's Code of Business Conduct and recommend to the Board of Directors of the Corporation whether or not to grant such waiver.

- **Receive and review reporting regarding calls to the Corporation's Ethics Line.**

(Emphasis added).

116.    The Human Capital and Compensation Committee Charter states the following, in

part:

The Committee's primary purposes are to:

- Discharge the Corporation's responsibilities relating to the compensation of the Corporation's Executive Officers. The Committee has overall responsibility for overseeing the benefit, bonus, incentive compensation, severance, equity-based or other compensation plans, policies and programs of the Corporation and its subsidiaries.

- Oversee management's development and implementation of the incentive compensation strategy for the Corporation.

- Oversee the incentive compensation plans, policies and programs encompassing those employees of the Corporation and its subsidiaries who, either individually or as part of a group, have the ability to expose the Corporation to material risk ("Covered Employees").

- Implement Chief Executive Officer ("CEO") succession planning.

- Make recommendations regarding director compensation to the Board of Directors.

- Prepare the annual report on executive compensation for inclusion in the Corporation's proxy statement, including review and discussion of the Compensation Discussion & Analysis with Management and disclosure of whether the Committee has retained or obtained the advice of a compensation consultant and if the work of the compensation consultant has raised any conflict of interest and, if so, the nature of the conflict and how it is being addressed.

117.    The Finance Committee Charter states the following, in part:

The Committee's primary purpose is to exercise, during the intervals between the meetings of the Board of Directors, all the powers of the Board of Directors of the Corporation and the Bank in the management of the business, properties and affairs of the Corporation and the Bank that may be permissibly exercised by a committee thereof.

118. The Nominating and Corporate Governance Committee Charter states the following, in part:

The Committee's primary purposes are to:

- Develop and recommend to the Board of Directors corporate governance policies and guidelines for the Corporation and for identifying and nominating director and committee member candidates; and

- Nominate directors for election to the Board of Directors and recommend appointment to committee membership.

119. The Risk and Compliance Committee Charter states the following, in part:

**The Committee's sole and exclusive function is responsibility for the risk management policies of the Corporation's and the Bank's global operation and oversight of its global risk management framework.** In furtherance of this function, the Committee shall:

- **Oversee management's compliance with all of Fifth Third's regulatory obligations arising under applicable federal and state banking laws, rules and regulations**;

- Oversee management's development and implementation of the global Risk Management Framework ("Framework"), inclusive of the risk appetite, with an enterprise view of risk capacity, risk tolerances, risk limits, and key risk indicators which are integral components of the Framework. In addition, the Framework includes consistent processes for identifying, assessing, managing, monitoring and reporting risks of all types, including the categories of credit risk, market risk, liquidity risk, operational risk, regulatory compliance risk, legal risk, reputation risk and strategic risk;

- **Oversee the fiduciary activities and fiduciary policies of the Corporation and its bank subsidiaries**; and

- Ensure that risk processes are supported by a risk governance structure that includes oversight by the Boards of Directors of the Corporation and the Bank, policies, risk limits, and risk committees, and further by a culture that supports risk management objectives and reflects appropriate accountability by all lines of defense.

- Oversee the Company's supervisory issues and enforcement actions and the Corporation's efforts to remediate them.

\*      \*      \*

5. Operational Risk

- Develop and maintain an Operational Risk Management Policy (the "OR Policy"), which shall be discussed by the Committee with management. Following such discussion, and after taking into consideration any matters as the Committee may deem advisable and appropriate, including management's recommendation, the Committee shall annually recommend the OR Policy to the Boards of Directors of the Corporation and the Bank for approval. In addition, the Committee may authorize management to develop and implement any additional detailed policies and procedures relating to operational risk as may be consistent with the OR Policy.

- **Review management reports relating to operational risk issues in areas including but not limited to: fraud; development of material products and services; execution, delivery and process management; acquisition** integration issues; technology risks and technology strategies; cybersecurity incidents and privacy breaches; business disruption and system failures; and business practices generally.

6. Legal Risk

- Management shall develop and maintain a Legal Risk Management Policy (the "Legal Risk Policy"), which policy shall be discussed by the Committee with management. Following such discussion, and after taking into consideration any matters as the Committee may deem advisable and appropriate, including management's recommendation, the Committee shall annually recommend the Legal Risk Policy to the Boards of Directors of the Corporation and the Bank for approval. In addition, the Committee may authorize management to develop and implement any additional detailed policies and procedures relating to legal risk as may be consistent with the Legal Risk Policy.

- **Review management reports relating to legal risk issues in areas including but not limited to: material litigation, legal settlements and defense complaints.**

\*        \*        \*

10. Fiduciary Activities

- Exercise general supervision over the exercise of the trust and other fiduciary powers of the Corporation, the Bank and their subsidiaries. In this capacity, the Committee will review and approve new trust accounts identified under the Corporation's policies as high-risk accounts and business initiatives by the wealth and asset management division. In discharging their responsibilities, the Committee shall review periodic

reports from designated management committees regarding the fiduciary activities of the Bank and other subsidiaries.

- Oversee of the fiduciary structure of the Corporation. In this regard, the Committee shall review and approve the policies and controls for each subsidiary including the Bank. The Committee shall review the reports from the management committees identifying significant trust and other fiduciary issues including internal audit results, internal compliance reports, internal investment reviews, regulatory exam results and material litigation.

(Emphasis added).

120. The Technology Committee Charter states, in part:

The Committee's primary purpose is to assist the Boards of Directors in their oversight of technology and innovation strategies, plans and operations, information, cybersecurity and data privacy risk management and third party technology risk management.

\* \* \*

C. Information, Cybersecurity and Data Privacy Risk Management

- Receive reports from members of management, including, but not limited to, the Chief Information Officer, the Chief Risk Officer, the Chief Information Security Officer, Chief Data Officer, and other officers or employees as appropriate, regarding the Corporation's practices, management and functioning of technology operations and information security, cybersecurity and data privacy risks, including reports related to the assessment, analysis, and mitigation of related risk.

- Review or discuss, as and when appropriate, the Corporation's technology policies, standards, and controls

121. Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, care and good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Fifth Third, the absence of good faith on their part and a

reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

122. The Individual Defendants breached their duties of loyalty, care and good faith by: (i) failing to implement and enforce a system of effective internal controls and procedures; (ii) failing to exercise their oversight duties by not monitoring the Company's compliance with state and federal laws and the Company's internal policies and procedures; (iii) consciously disregarding and failing to ensure that the Company was following proper sales practices, resulting in the commencement of the CFPB Action and the Securities Class Action; (iv) failing to fully, fairly, and timely disclose the scope and impact of the improper sales practices taught to and used by the Company's employees and managers; (v) failing to timely take corrective action to reduce and/or eliminate the illegal sales practices taught to and used by the Company's employees and managers; (vi) failing to revise the Company's incentive pay structure to reduce the likelihood of employees and managers engaging in unlawful sales practices; (vii) making and/or causing the Company to make false and misleading statements and/or material omissions resulting in the commencement of the Securities Class Action; (viii) allowing the Company to violate multiple federal and state laws and regulations; (ix) failing to take appropriate remedial action when the Board knew, or should have known, that there was pervasive misconduct at the Company; (x) failing to act in the best interests of the Company and instead acting for their own self-interest; and (xi) consciously causing substantial damage to the Company's credibility, corporate image, and goodwill.

## SUBSTANTIVE ALLEGATIONS

### Fifth Third Utilized and Encouraged Cross-Selling Business Strategies and Incentive Programs For Years

123.    As part of the Company's business practices, Fifth Third Bank employed Cross-Selling.[6]  This business strategy was used by Fifth Third Bank until at least 2016, and as more fully discussed below, recent SEC filings indicate that Cross-Selling is a still an aspect of Fifth Third's business strategy.

124.    Fifth Third Bank's Cross-Selling was designed to increase the total number of products and services that were provided to existing bank clients.

125.    Employees of Fifth Third Bank were incentivized to aggressively support and utilize Cross-Selling, as performance ratings and retention were conditioned upon achieving ambitious sales goals.  Further, incentive compensation awards for managers were largely premised on lower-level employees selling new products and services to existing customers through Cross-Selling.

126.    The sales goals imposed upon Fifth Third Bank employees and incorporated into the incentive-based compensation program "were often set at a level higher than the anticipated sales for thousands of employees."[7]

127.    In an effort to achieve lofty sales goals, employees began opening unauthorized consumer-financial products and services, the Unauthorized Accounts.  As alleged in the CFPB Action, Fifth Third Bank employees "opened deposit accounts in consumers' names; . . . issued credit cards; . . . and opened lines of credit on consumers' accounts."[8]

---

[6] Cross-selling is a business strategy (hereinafter referred to as "Cross-Selling") that purportedly allows banks and nearly every other business to achieve organic growth cheaper than obtaining new clients and serves to promote customer retention.
[7] Compl. ¶ 15, CFPB Action, ECF No. 1.
[8] *Id.* ¶ 5.

128.    Once Fifth Third Bank employees established Unauthorized Accounts in existing clients' names, employees would "transfer[] funds from consumers' existing accounts to new, improperly opened accounts [or] . . . enroll[] customers in online-banking services."[9]

129.    A Fifth Third Bank employee's failure to achieve the established sales goals could result in the employee receiving a substandard or low performance review and in certain instances, employees may be subject to termination.[10]

130.    After an extensive investigation, the CFPB alleges that:

Fifth Third imposed sales goals on all levels of Branch employees as part of its efforts to cross-sell; set goals that thousands of its employees could not achieve; threatened employees with termination or other disciplinary action if they failed to meet their goals; established a system under which managers pressured subordinate employees to sell; failed to take steps to determine and address a root cause of unauthorized accounts, which was consistently said by employees to be intense sales pressure; failed to close known loopholes in its collection of proof of consumer authorization, thereby making it easy for employees to open accounts without valid signature cards for deposit accounts or applications for credit products; and failed to take reasonable steps to identify, notify, and remediate identifiable consumers victimized by unauthorized account-openings.[11]

131.    Fifth Third and the Individual Defendants were aware, should have been aware, or willfully, negligently, or intentionally ignored the fraudulent actions of its employees and managers involving the opening of the Unauthorized Accounts.

132.    According to the CFPB Action, Fifth Third Bank was aware of the employees' actions and these Unauthorized Accounts since 2008.[12]

133.    In an email dated June 8, 2010, a Fifth Third Bank employee who was identified by the CFPB as the "head of retail banking" noted:

Performance is high, but my belief around [the] method of achieving success is somewhat suspect.  [Redacted] and his leadership team have a reputation of less

---

[9] *Id.*
[10] *Id.* ¶ 15.
[11] *Id.* ¶ 67.
[12] *Id.* ¶ 5.

than desirable sales management practices. Bullying and threats are often used to achieve results. As you probably know, there have been consistent problems around unauthorized credit card sales in Chicago.[13]

134.    Additionally, in a 2011 letter to management (the "Letter"), a Fifth Third Bank employee raised concerns regarding the Company's culture.   The Letter indicates that the employee attempted to previously raise the concerns through the Company's ethics hotline (which is overseen by the Audit Committee); however, the concerns went unresolved:

> I have tried to raise concerns through the ethics hotline, however it doesn't appear that anything has come of it. I have notified them on numerous occasions. I have notified my FCM and CSM as well, and they have forwarded my concerns to their management team never to receive a response as well. My management team supports me 100%, and operates as I do with a high degree of integrity. Their support is the sole reason I have lasted here for 2 years and I owe them a great deal of respect.[14]

135.    The Letter raises concerns regarding unethical behavior at Fifth Third Bank regarding accounts, as well as perceived sexual harassment.  The Letter states, in relevant part:

> I can only speak on behalf of my region, but I would consider many of the sales practices and tactics used to be predatory.  Many of these sales practices were brought to us by regional and market management.  They are openly discussed on our conference calls.  Policies such as "everyone should have 2-3 checking accounts", or people "upgrading" (switching existing MasterCard customers to Visa rewards) credit cards for [a] customer without telling them they are applying for new credit".  **We are becoming a "predatory" institution.**

> Every week I come across at least 1 or 2 customer[s] that have been taken advantage of.  **The most common thing I see is customers that have 2 or 3 other checking accounts that they didn't even know they had.**  Some customers have secure checking accounts only to be used for ID Alert. When they can simply add ID alert to the DDA they already have. Some customers have the Secure Checking account as a secondary and are paying for ID alert on their primary checking account. I come across Hispanic customers that don't understand or speak English that were sold products they don't understand by individuals that don't speak Spanish.

*      *      *

---

[13] Opp'n to Mot. to Transfer Venue ("Opp'n Mot."), Ex. 1, CFPB Action, ECF No. 39-2.
[14] *Id.*, Ex. 2 at 1, ECF No. 39-3.

The motivation for these practices is simple, **if you don't meet your goal you get fired.** That's what I've been told, and that's what other employees have been told, they are pushing the ethical envelope in order to save their jobs. I do not open as many accounts as some of my peers and the main reason is I refuse to partake in the practices. I brought specific issues to the attention of my manager and the regional manager, on numerous occasions. **Being able to open and close accounts existing customer accounts or adding 3 ddas to existing customers is being perceived as production. We aren't gaining new households; we're simply rotating our existing customer base for numbers**, in fact we're losing more customers than we're gaining, and costing the bank money. Many customers are frustrated with the sales practice and subsequently leaving the bank.[15]

136.     Based on ¶¶ 130 – 35, Fifth Third and the Individual Defendants were on notice, should have been on notice, or willfully, negligently, or intentionally ignored the fraudulent actions of its employees and predatory sales and business practices employed surrounding the Unauthorized Accounts.

137.     Fifth Third and the Individual Defendants were aware of the questionable business tactics associated with Cross Selling.  As alleged in the CFPB Action, "Fifth Third [Bank] tracked internally investigated cases of what it called 'gaming.'  Gaming, according to Fifth Third, includes opening unauthorized accounts."[16]

138.     Strikingly, Fifth Third Bank admitted that between 2010 and 2016, it had opened at least 1,000 Unauthorized Accounts.[17]

139.     Even though Fifth Third Bank admits that Unauthorized Accounts were opened, the Company and the Individual Defendants failed to address the growing problem and instead, continued to incentivize employees and managers based on Cross Selling metrics.

---

[15] *Id.* at 2-3 (emphasis added).

[16] Opp'n Mot. at 5, ECF No. 39; *see also id.*, Ex. 3 at 30:21-24("Gaming would hone [sic] in more on something that potentially could have harmed a customer, like we did something without the consent of a customer."), ECF No. 39-4; *id.*, Ex. 5 at 14:7-9 (suggesting that potential gaming is exemplified when "[c]ustomer alleges or complains that they received a credit card and they didn't apply for the credit card"), ECF No. 39-6.

[17] Def.'s Mot. to Transfer Venue at 6, CFPB Action, ECF No. 20.

140. The Company's DEF 14A Proxy Statement filed on March 9, 2017 (the "2017 Proxy Statement") explained the 2017 executive compensation plan changes, including that "customer experience was added to the plan as a funding modifier." The 2017 Proxy Statement explains that, "[t]he addition of customer experience to the plan will add specific focus to the cornerstone of our business strategy of 'putting the customer at the center of all we do.'"

141. The 2017 Proxy Statement also includes changes that the Company made to performance goals, including criteria that would award executives for the following: "Workforce, customer or market-related objectives (including, but not limited to, employee satisfaction, customer satisfaction, *customer growth, number or type of customer relationships* and market share)" (emphasis added). Therefore, the Company's executives were also being incentivized to increase customer growth and the number or type of customer relationships. As a result, the Company's executives were motivated to push Cross-Selling and aggressive incentives on the Company's employees.

142. Fifth Third Bank, the Company, and the Individual Defendants failed to adequately address the issues surrounding Cross-Selling or "gaming". In fact, it is noted by the Company's corporate designee in the CFPB Action, Darrin Steinmann, that "[Fifth Third Bank does not] have a systematic way of detecting gaming."[18] Darrin Steinmann has been the Company's Director of Corporate Investigations for more than twenty-five years.

143. The Company and the Individual Defendants failed to adequately and sufficiently implement, monitor, and oversee the incentive programs tied to Fifth Third Bank's Cross-Selling business strategy.

---

[18] Opp'n Mot., Ex. 5 at 13:15-16, ECF No. 39-6.

144.    Upon learning of the Unauthorized Accounts, the Company and the Individual Defendants failed to detect, stop, identify, and remediate harm caused to clients.

**Fifth Third and the Individual Defendants Issued False and Misleading Statements**

*2015 Form 10-K*

145.    On February 25, 2016, Fifth Third filed an Annual Report on Form 10-K with the SEC for the period ending December 31, 2015 (the "2015 Form 10-K").

146.    According to the 2015 Form 10-K, the Company reported $1.712 billion in net income attributable to the Company and $1.637 billion in net income available to common shareholders.  Additionally, basic earnings per share were $2.03 and diluted earnings per share were $2.01.

147.    The 2015 Form 10-K touted the Company's support and use of Cross-Selling to reign in higher profits.  According to the 2015 Form 10-K:

> The Bancorp, through Fifth Third Capital Holdings, a wholly-owned indirect subsidiary of the Bancorp, invests as a limited partner in private equity funds which provide the Bancorp an opportunity to obtain higher rates of return on invested capital, while also creating cross-selling opportunities for the Bancorp's commercial products.

148.    According to the 2015 Form 10-K, the Company exploits its multiple business segments in an effort to expand and capitalize upon potential Cross-Selling opportunities. Specifically, the 2015 Form 10-K notes, "the business segments form synergies by taking advantage of cross-sell opportunities and when funding operations by accessing the capital markets as a collective unit."

149.    While the Company indicates that it capitalizes and exploits Cross-Selling opportunities, Fifth Third suggests that it has safeguards in place to prevent the Unauthorized Accounts aforementioned.  Specifically, the 2015 10-K states:

Regulatory Compliance Risk Management provides independent oversight to ensure that an enterprise-wide framework, including processes and procedures, are in place to comply with applicable laws, regulations, rules and other regulatory requirements; internal policies and procedures; and principles of integrity and fair dealing applicable to the Bancorp's activities and functions The Bancorp focuses on managing regulatory compliance risk in accordance with the Bancorp's integrated risk management framework, which ensures consistent processes for identifying, assessing, managing, monitoring and reporting risks[.]

150. Additionally, Fifth Third acknowledges that the banking industry is under heightened scrutiny from regulators and other governmental officials, noting:

The current regulatory environment, including heightened regulatory expectations and material changes in laws and regulations, increases compliance risk. To mitigate compliance risk, Compliance Risk Management provides independent oversight to ensure consistency and sufficiency, and ensures that lines of business, regions and support functions are adequately identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies. The lines of business and enterprise functions are responsible for managing the compliance risks associated with their areas. Additionally, Compliance Risk Management implements key compliance programs and processes including but not limited to, risk assessments, key risk indicators program, issues tracking, regulatory compliance testing and monitoring, anti-money laundering, privacy, and oversees the Bancorp's compliance with the Community Reinvestment Act.

151. Fifth Third's management and the Individual Defendants were aware, should have been aware, or willfully ignored ongoing compliance risks, and the issues raised by employees described in ¶¶ 130 – 35. Specifically, the 2015 Form 10-K states:

Fifth Third also focuses on reporting and escalation of compliance issues to senior management and the Board. The Management Compliance Committee is the key committee that oversees and supports Fifth Third in the management of compliance risk across the enterprise. The Management Compliance Committee addresses Fifth Third-wide compliance issues, industry best practices, legislative developments, regulatory concerns, and other leading indicators of compliance risk. The Management Compliance Committee reports to the Enterprise Risk Management Committee, which reports to Risk and Compliance Committee of the Board of Directors.

152.    Additionally, the 2015 Form 10-K acknowledges that, "Fifth Third is subject to various regulatory requirements that may limit its operations and potential growth." Specifically, the 2015 Form 10-K states, in relevant part:

> Under federal and state laws the regulations pertaining to the safety and soundness of insured depository institutions and their holding companies, the FRB, the FDIC, the CFPB and the Ohio Division of Financial Institutions have the authority to compel or restrict certain actions by Fifth Third and its banking subsidiary. . . . In addition, Fifth Third, . . . [has] recently been subjected to increased scrutiny from government authorities, including bank regulatory authorities, stemming from broader systemic regulatory concerns, including with respect to stress testing, capital levels, asset quality, provisioning, AML/BSA, consumer compliance and other prudential matters and efforts to ensure that financial institutions take steps to improve their risk management and prevent future crises. In this regard, government authorities, including the bank regulatory agencies, are also pursuing aggressive enforcement actions with respect to compliance and other legal matters involving financial activities, which heightens the risks associated with actual and perceived compliance failures and may also adversely affect Fifth Third's ability to enter into certain transactions or engage in certain activities, or obtain necessary regulatory approvals in connection therewith.

153.    Defendants Carmichael, Tuzun, Williams, Akins, Bayh, Benitez, Blackburn, Brumback, Heminger, Hoover, and McCallister signed and affirmed the 2015 Form 10-K.

***2016 Form 10-K***

154.    On February 24, 2017, Fifth Third filed an Annual Report on Form 10-K with the SEC for the period ending December 31, 2016 (the "2016 Form 10-K").

155.    According to the 2016 Form 10-K, the Company reported $1.564 billion in net income attributable to the Company and $1.489 billion in net income available to common shareholders. Additionally, basic earnings per share were $1.95 and diluted earnings per share were $1.93.

156.    The 2016 Form 10-K contained the same language as the 2015 Form 10-K with regards to the Company's Cross-Selling:

42

[t]he Bancorp, through Fifth Third Capital Holdings, a wholly-owned indirect subsidiary of the Bancorp, invests as a limited partner in private equity funds which provide the Bancorp an opportunity to obtain higher rates of return on invested capital, while also creating cross-selling opportunities for the Bancorp's commercial products.

\*       \*       \*

Additionally, the business segments form synergies by taking advantage of cross-sell opportunities and when funding operations by accessing the capital markets as a collective unit.

157.    The 2016 Form 10-K also incorporates similar language regarding regulatory compliance, heightened regulatory and governmental scrutiny, and that compliance issues are raised to the Board of Directors through the Enterprise Risk Management Committee.

158.    The allegations alleged in ¶¶ 149 – 52 are reincorporated as if set forth at length herein as substantively similar language from the 2015 Form 10-K appears within the 2016 Form 10-K.

159.    Defendants Carmichael, Tuzun, Williams, Akins, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, and Mallesch signed and affirmed the 2016 Form 10-K.

***2017 Form 10-K***

160.    On February 28, 2018, Fifth Third filed an Annual Report on Form 10-K with the SEC for the period ending December 31, 2017 (the "2017 Form 10-K").

161.    According to the 2017 Form 10-K, the Company reported $2.194 billion in net income attributable to the Company and $2.119 billion in net income available to common shareholders. Additionally, basic earnings per share were $2.88 and diluted earnings per share were $2.83.

162.    The 2017 Form 10-K contained the same language as the 2015 Form 10-K and the 2016 Form 10-K with regards to the Company's Cross-Selling:

The Bancorp, through Fifth Third Capital Holdings, a wholly-owned indirect subsidiary of the Bancorp, invests as a limited partner in private equity funds which provide the Bancorp an opportunity to obtain higher rates of return on invested capital, while also creating cross-selling opportunities for the Bancorp's commercial products.

*    *    *

Additionally, the business segments form synergies by taking advantage of cross-sell opportunities and when funding operations by accessing the capital markets as a collective unit.

163.    The 2017 Form 10-K also incorporates similar language regarding regulatory compliance, heightened regulatory and governmental scrutiny, and that compliance issues are raised to the Board of Directors through the Enterprise Risk Management Committee.

164.    The allegations alleged in ¶¶ 149 - 52 are reincorporated as if set forth at length herein, as substantively similar language from the 2015 Form 10-K and 2016 Form 10-K appears within the 2017 Form 10-K.

165.    Defendants Carmichael, Tuzun, Williams, Bayh, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch, and McCallister signed and affirmed the 2017 Form 10-K.

### *2018 Form 10-K*

166.    On March 1, 2019, Fifth Third filed an Annual Report on Form 10-K with the SEC for the period ending December 31, 2018 (the "2018 Form 10-K").

167.    According to the 2018 Form 10-K, the Company reported $2.193 billion in net income attributable to the Company and $2.118 billion in net income available to common shareholders.  Additionally, basic earnings per share were $3.11 and diluted earnings per share were $3.06.

168.    The 2018 Form 10-K contained the same language as the 2015 Form 10-K, 2016 Form 10-K, and 2017 Form 10-K with regards to the Company's Cross-Selling:

The Bancorp, through Fifth Third Capital Holdings, a wholly-owned indirect subsidiary of the Bancorp, invests as a limited partner in private equity funds which provide the Bancorp an opportunity to obtain higher rates of return on invested capital, while also creating cross-selling opportunities for the Bancorp's commercial products.

\*     \*     \*

Additionally, the business segments form synergies by taking advantage of cross-sell opportunities and when funding operations by accessing the capital markets as a collective unit.

169.    The 2018 Form 10-K also incorporates similar language regarding regulatory compliance, heightened regulatory and governmental scrutiny, and that compliance issues are raised to the Board of Directors through the Enterprise Risk Management Committee.

170.    The allegations alleged in ¶¶ 149 - 52 are reincorporated as if set forth at length herein as substantively similar language appears within the 2018 Form 10-K compared to the 2015 Form 10-K, 2016 Form 10-K, and 2017 Form 10-K.

171.    Defendants Carmichael, Tuzun, Akins, Bayh, Benitz, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch, and McCallister signed and affirmed the 2018 Form 10-K.

***2019 Form 10-K***

172.    On March 2, 2020, Fifth Third filed an Annual Report on Form 10-K with the SEC for the period ending December 31, 2019 (the "2019 Form 10-K").

173.    According to the 2019 Form 10-K, the Company reported $2.512 billion in net income attributable to the Company and $2.419 billion in net income available to common shareholders.  Additionally, basic earnings per share were $3.38 and diluted earnings per share were $3.33.

174.    The 2019 Form 10-K contained similar language regarding the Company's use an exploitation of Cross-Selling.  Specifically, the 2019 Form 10-K states, "the business segments

form synergies by taking advantage of cross-sell opportunities and funding operations by accessing the capital markets as a collective unit."

175.    The 2019 Form 10-K also incorporates similar language regarding regulatory compliance, heightened regulatory and governmental scrutiny, and that compliance issues are raised to the Board through the Enterprise Risk Management Committee.

176.    The allegations alleged in ¶¶ 149 - 52 are reincorporated as if set forth at length herein as substantively similar language appears within the 2019 Form 10-K compared to the 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, and 2018 Form 10-K.

177.    Defendants Carmichael, Tuzun, Williams, Akins, Bayh, Benitez, Blackburn, Brumback, Burris, Daniels, Harvey, Heminger, Hoover, Mallesch, and McCallister signed and affirmed the 2019 Form 10-K.

178.    The statements identified in ¶¶ 145 - 77 were materially false and misleading because the Company and the Individual Defendants failed to disclose material facts regarding Fifth Third and the Company's business practices, operations, incentive programs, as well as Fifth Third's predatory Cross-Selling.  Specifically, the Company and the Individual Defendants failed to disclose and/or provided false and/or misleading statements with regards to: (i) Company employees fraudulently opening Unauthorized Accounts; (ii) the Company incentivizing and rewarding employees and management for establishing Unauthorized Accounts; (iii) the Company's and the Individual Defendants' awareness of the unethical and fraudulent activity surrounding the Unauthorized Accounts since at least 2008; (iv) the Company being in violation of federal and state laws and regulations designed to protect clients from instances such as the opening of Unauthorized Accounts; (v) the Company and Individual Defendants failing to implement, maintain, and oversee the Company's Cross-Selling strategies and initiatives; (vi) the

Company and Individual Defendants failing to identify and mitigate misconduct associated with Cross-Selling, and failing to remediate the harm caused to consumers who were subjected to Unauthorized Accounts; (vii) as a result of (i) – (vi), the Company being subject to a heightened level of risk and enforcement action that was not accurately or fully captured in the 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K, or 2019 Form 10-K; (viii) Fifth Third's revenue, net income, customer retention, new accounts, *inter alia*, provided a false and misleading picture of the Company's true financial status as the figures reported contained results based on unlawful and unethical conduct that is unsustainable; and (ix) as a result of (i) – (viii), Fifth Third's public statements were materially false and misleading.

### *2018-2020 Proxy Statements*

179.    On March 6, 2018, the Company filed its DEF 14A Proxy Statement (the "2018 Proxy Statement").  On March 6, 2019, the Company filed its 2019 Proxy Statement.  On March 4, 2020, the Company filed its 2020 Proxy Statement.   Each member of the Board, except for non-parties Feiger and Clement-Holmes, authorized the dissemination of at least one of Fifth Third's 2018 Proxy Statement, 2019 Proxy Statement, and 2020 Proxy Statement (collectively, the "Proxy Statements").

180.    According to the Proxy Statements:

> At Fifth Third, we endeavor to attract and retain the best people and motivate them to fulfill the Company's vision of becoming the "One Bank that people most value and trust." We intend to accomplish this by aligning our company strategy and goals with our shareholders' long-term interests, by establishing compensation programs that reward our employees for delivering products and services our customers highly value, ***and by avoiding excessive risk.*** Our compensation philosophy guides us in this endeavor.

(Emphasis added.)

181. The Proxy Statements discuss the Company's executive officers role in compensation decisions:

> The chief executive officer annually reviews the performance of each of the other Named Executive Officers, which includes a risk performance assessment completed by the Company's chief risk officer. Based on this review, the chief executive officer makes compensation recommendations to the Committee, including recommendations for salary adjustments, Variable Compensation Plan awards, and long-term, equity-based incentive awards. In addition, the chief executive officer and certain other members of management annually assess performance for other executive officers and make compensation recommendations to the Committee. Although the Committee considers these recommendations along with data provided by its consultant, F.W. Cook, it retains full discretion to set all compensation for the Company's executive officers. The Committee works directly with its consultant to determine compensation for the chief executive officer. The chief executive officer has no input into his/her own compensation determinations.

> Additionally, the chief risk officer reviews and evaluates with the Committee all executive officer and employee incentive compensation plans, described in more detail in the Compensation Risk Management section above. ***The purpose of the review is to confirm that the Company's incentive compensation plans do not incent or pose unnecessary or excessive risks to the Company***.

(Emphasis added.)

182. According to the 2020 Proxy Statement:

> The Audit Committee has also established Fifth Third's EthicsLine, a toll-free hotline and web portal through which confidential complaints may be made regarding: illegal or fraudulent activity; questionable accounting, internal controls, or auditing matters; conflicts of interest, dishonest or unethical conduct, including incentive gaming; disclosures in the Company's SEC reports, bank regulatory filings, and other public disclosures that are not full, fair, accurate, timely, and understandable; violations of our Code of Business Conduct and Ethics; and/or any other violations of laws, rules, or regulations. The contact information for the EthicsLine is available in the Code of Business Conduct and Ethics, which is available at our website. ***Complaints submitted through this process are presented to the Audit Committee on a regular, periodic basis.***

(Emphasis added.)

183. The Individual Defendants encouraged and fostered a culture of unnecessary risk taking. Further, the Board and Audit Committee must have been aware of the misconduct because

of the Audit Committee's responsibility for handling employee complaints on a regular basis. As described herein, including ¶ 214, the Company received many complaints. Thus, the Proxy Statements were false and misleading by stating that the Company's compensation programs were tailored to avoid risks.

184.    The Proxy Statements contained false statements and omitted material facts necessary to make the discussion of the Company's business operations and internal controls not false and misleading. Specifically, the Proxy Statements failed to disclose, *inter alia*, that: (i) the Board was on notice for years of the misconduct described herein; (ii) the Company's use of Cross-Selling and incentives caused its employees to engage in the misconduct described herein; (iii) the Company was aware of the misconduct as early as 2008, but neglected to design and monitor the Company's Cross-Selling and incentive compensation in a way that would identify and prevent the misconduct described herein; (iv) there were material weaknesses in the Company's internal controls; (v) the Company was at a heightened risk of regulatory action due to the misconduct described herein; and (vi) the Company's earnings were at least partially a result of the misconduct described herein and were not sustainable.

185.    Further, the Proxy Statements issued by certain of the Individual Defendants were false and misleading as to the extent they contained information describing the Company's compliance with governmental policies and regulations. The Proxy Statements were further false and misleading as the Individual Defendants failed to comply with the Company's Code while representing that the application of its terms was nonnegotiable. Moreover, the Proxy Statements were false and misleading by not disclosing the misconduct discussed herein and the scheme to issue false and misleading statements and/or omit material facts necessary for shareholders to make informed decisions regarding the Company.

**Risk and Compliance Changes at Fifth Third Prior to the CFPB Action**

186.    On January 30, 2020, Fifth Third filed a Current Report on Form 8-K with the SEC

(the "January 2020 Form 8-K").  The January 2020 Form 8-K noted that Fifth Third:

> Promoted James C. Leonard to Executive Vice President and Chief Risk Officer,
> . . . Frank R. Forrest has been appointed to the role of Executive Vice President and
> Special Advisor for Risk Management and Regulatory Matters of the Company, to
> serve until December 31, 2020, at which time he will retire from the Company.

187.    On the same day, Fifth Third issued a press release announcing the leadership

change (the "January 2020 PR").  The January 2020 PR notes that "Frank Forrest . . . has served

as executive vice president and chief risk officer since 2014."  The January 2020 PR continues to

state that in Frank Forrest's new "role he will continue reporting to Greg Carmichael, Fifth Third

chairman, president and CEO."

188.    Neither the January 2020 Form 8-K nor the January 2020 PR provide any indication

as to why the transition of the Company's Chief Risk Officer was necessary or whether it was

based on actual or perceived misconduct.  Instead, the January 2020 PR states that "changes to

certain senior leadership roles [were made] in order to position the Company for continued success

in executing its key strategic priorities."

189.    Beyond stating that Forrest's transition would occur, among other executive moves,

the January 2020 PR simply includes the following quote from Defendant Carmichael:

> Frank has successfully led our risk management transformation and conversion to
> a national charter, and we look forward to his continued counsel and contributions
> as we move through 2020.

190.    The January 2020 PR also stated the following about James C. Leonard,

> Jamie Leonard, who has worked at the Company for more than 20 years, succeeds
> Forrest as chief risk officer. Leonard most recently served as executive vice
> president and treasurer for the past six years. During his tenure as treasurer, he
> managed capital, liquidity and interest rate risk. Leonard also served on the
> corporate credit committee. In his role he will report to Carmichael.

**The CFPB Action**

191.    On March 2, 2020, less than two months after announcing that the Company's Chief

Risk Officer was being transitioned into a new role, Fifth Third filed its 2019 Form 10-K.

192.    Under the heading "Governmental Investigations and Proceedings," the

Company's 2019 Form 10-K states:

> For example, the CFPB staff has notified Fifth Third that it intends to file an
> enforcement action in relation to alleged unauthorized account openings. Fifth
> Third believes that the facts do not warrant an enforcement proceeding and intends
> to defend itself vigorously if such an action should be filed. The impact of this
> potential enforcement action has been reflected in our reasonably possible losses.

193.    According to the 2019 Form 10-K:

> For matters where the Bancorp is able to estimate such possible losses or ranges of
> possible losses, the Bancorp currently estimates that it is reasonably possible that it
> could incur losses related to legal and regulatory proceedings, including known
> contemplated enforcement actions and Fifth Third's intended response to such
> actions, in an aggregate amount up to approximately $56 million in excess of
> amounts accrued.

194.    On March 3, 2020, the day after Fifth Third filed its 2019 Form 10-K the

Company's shares opened for trading at $25.72; however, by market close, Fifth Third shares

closed at $24.44.  Over the next few trading days, Fifth Third's share price continued to fall and

on March 6, 2020, the Company's share price fell to $22.20.

195.    Beyond the statement contained within the Company's 2019 Form 10-K regarding

the CFPB's intention to file an enforcement action, the Company and Individual Defendants failed

to provide investors with full information regarding Fifth Third's misconduct and the

Unauthorized Accounts.

196.    The statements regarding the potential CFPB enforcement action are misleading to

investors and the public as a whole.  The Company's 2019 Form 10-K notes, "Fifth Third believes

that the facts do not warrant an enforcement proceeding"; however, as referenced in ¶ 138, Fifth Third Bank admitted in the CFPB Action that at least 1,000 Unauthorized Accounts were opened between 2010 and 2016, and the Company and Individual Defendants were on notice.

197.    While the 2019 Form 10-K included the minimal statement regarding the CFPB's intention to file a lawsuit, the Company continued to tout Fifth Third's Cross-Selling, regulatory compliance, heightened regulatory and governmental scrutiny, and that compliance issues are raised to the Board of Directors through the Enterprise Risk Management Committee.

198.    The statements referenced in ¶¶ 192 – 93 were materially false and misleading because the Company and the Individual Defendants failed to disclose material facts regarding Fifth Third and the Company's business practices, operations, incentive programs, as well as Fifth Third's predatory Cross-Selling. Specifically, the Company and the Individual Defendants failed to disclose and/or provided false and/or misleading statements with regards to: (i) Company employees fraudulently opening Unauthorized Accounts; (ii) the Company incentivizing and rewarding employees and management for establishing Unauthorized Accounts; (iii) the Company and Individual Defendants being aware of the unethical and fraudulent activity surrounding the Unauthorized Accounts since at least 2008; (iv) the Company being in violation of federal and state laws and regulations designed to protect clients from instances such as Unauthorized Accounts; (v) the Company and Individual Defendants failing to implement, maintain, and oversee the Company's Cross-Selling; (vi) the Company and Individual Defendants failing to identify and mitigate misconduct associated with Cross-Selling, and failing to remediate the harm caused to consumers who were subjected to Unauthorized Accounts; (vii) as a result of (i) – (vi), the Company being subject to a heightened level of risk and enforcement action that was not accurately or fully captured in the 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K, or

2019 Form 10-K; (viii) Fifth Third's revenue, net income, customer retention, new accounts, *inter alia*, provided a false and misleading picture of the Company's true financial status as the figures reported contained results based on unlawful and unethical conduct that is unsustainable; and (ix) as a result of (i) – (viii), Fifth Third's public statements were materially false and misleading.

199.     On March 9, 2020, the CFPB announced that it initiated a lawsuit, the CFPB Action, against Fifth Third Bank in the United States District Court, Northern District of Illinois, Eastern Division.[19]

200.     The same day the CFPB issued a press release (the "CFPB PR") entitled "Consumer Financial Protection Bureau Files Suit Against Fifth Third Bank, National Association for Allegedly Opening Unauthorized Accounts and Enrolling Consumers in Unauthorized Products and Services."[20]

201.     The CFPB's press release stated, in relevant part:

> The Consumer Financial Protection Bureau (Bureau) today filed a lawsuit in federal district court in the Northern District of Illinois against Fifth Third Bank, National Association (Fifth Third). The Bureau alleges that for several years Fifth Third, without consumers' knowledge or consent: opened deposit and credit-card accounts in consumers' names; transferred funds from consumers' existing accounts to new, improperly opened accounts; enrolled consumers in unauthorized online-banking services; and activated unauthorized lines of credit on consumers' accounts. The Bureau alleges that Fifth Third violated the Consumer Financial Protection Act's prohibition against unfair and abusive acts or practices as well as the Truth in Lending Act and the Truth in Savings Act and their implementing regulations.

> The Bureau specifically alleges that for years and continuing through at least 2016, Fifth Third used a "cross-sell" strategy to increase the number of products and services it provided to existing customers; used an incentive-compensation program to reward selling new products; and conditioned employee-performance ratings and, in some instances, continued employment on meeting ambitious sales goals. The Bureau further alleges that, despite knowing since at least 2008 that employees were opening unauthorized consumer-financial accounts, Fifth Third

---

[19] *Bureau of Consumer Financial Protection v. Fifth Third Bank, National Association*, Case Number 1:20-cv-01683 ("CFPB Action").
[20]    https://www.consumerfinance.gov/about-us/newsroom/cfpb-files-suit-against-fifth-third-for-allegedly-opening-unauthorized-accounts-enrolling-consumers-in-unauthorized-products/.

took insufficient steps to detect and stop the conduct and to identify and remediate harmed consumers.

Reasonable sales goals and performance incentives are not inherently harmful. But when such programs are not carefully and properly implemented and monitored, as the Bureau alleges here, they may create incentives for employees to engage in misconduct in order to meet goals or earn additional compensation.[21]

202.    The CFPB Action alleges that Fifth Third Bank was aware "since at least 2008 that employees were opening unauthorized consumer-financial products and services," Fifth Third Bank failed to adequately "implement and monitor its program, detect and stop misconduct and identify and remediate harmed consumers."[22]

203.    Additionally, the CFPB Action alleges that Fifth Third Bank's "conduct violated the Consumer Financial Protection Act of 2010 (CFPA), the Truth in Lending Act (TILA), the Truth in Savings Act (TISA), and their implementing regulations."[23]

204.    Further, the CFPB Action alleges that, "[f]rom at least 2010 through at least 2016, Fifth Third [Bank] opened deposit accounts for existing Fifth Third [Bank] customers without the customers' knowledge or consent."[24]

205.    Also, the CFPB Action alleges that, "[f]rom at least 2008 through at least 2016, Fifth Third [Bank] issued credit cards to existing customers without their knowledge or consent. By 2009, at the latest, Fifth Third [Bank] noticed a spike in unauthorized credit cards being issued to consumers."[25]

206.    The CFPB Action continues to allege that, "[f]rom at least 2010 through at least 2016, Fifth Third [Bank] enrolled consumers in online-banking services without their knowledge

---

[21] *Id.*
[22] Compl. ¶ 5, CFPB Action, ECF No. 1.
[23] *Id.* ¶ 6.
[24] *Id.* ¶ 19.
[25] *Id.* ¶¶ 24-25.

or consent."[26]

207.    Moreover, the CFPB Action alleges that, "Fifth Third [Bank] opened unauthorized Early Access lines of credit from at least 2010 through 2014, and Fifth Third [Bank] retained unauthorized Early Access lines of credit even after it stopped offering new Early Access lines of credit."[27]   Further, according to the CFPB, "Fifth Third [Bank] was aware of this by June 2010, when senior management was notified of an increase in the number of calls by employees to the internal whistleblower hotline regarding the unauthorized opening of Early Access lines of credit."[28]  As noted above, complaints submitted through the Fifth Third's EthicsLine are presented to the Audit Committee on a regular, periodic basis.

208.    Upon publication of the CFPB PR and the filing of the CFPB Action, Fifth Third's share price began to fall.

209.    On March 9, 2020, Fifth Third's stock opened at $20.02 per share; however, the Company's share price closed at $18.30 per share.  Over the next couple of trading days Fifth Third's share price continued to fall and on March 11, 2020 the Company's share price closed at $17.66 per share.  Fifth Third's share price continued to fall and on March 18, 2020 the Company's share price closed at $11.67 per share.

**Fifth Third's Response to the CFPB Action**

210.    In response to the CFPB Action, on March 9, 2020 Fifth Third filed a Current Report on Form 8-K with the SEC (the "March 9, 2020 Form 8-K") along with an attached press release entitled "Fifth Third Bancorp Rejects Charges in CFPB's Civil Lawsuit, Points to Its Customer Commitment and Proven Track Record of Aligning Employee Incentives with

---

[26] *Id*. ¶ 29.
[27] *Id*. ¶ 33.
[28] *Id*. ¶ 32.

Customer-Focused Best Practices" (the "March 2020 PR"), a fact sheet (the "March 2020 Fact Sheet") and a list of frequently asked questions (the "March 2020 FAQ") (collectively referred to as the "March 2020 Responses").

211.     The March 9, 2020 Form 8-K stated the following, in relevant part, "[o]n March 9, 2020, Fifth Third Bancorp issued a press release regarding its litigation with the Consumer Financial Protection Bureau. Fifth Third is also furnishing a fact sheet and answers to frequently asked questions relating to this matter."

212.     The March 2020 PR stated that, "Fifth Third Bancorp (Nasdaq: FITB) today rejected the allegations made by the Consumer Financial Protection Bureau ("CFPB") in a civil lawsuit."

213.     Similarly, the March 2020 Fact Sheet again stated "Fifth Third Bank Rejects CFPB Allegations" in prominent, bold face across the document's header.  Additionally, the March 2020 Fact Sheet states, in relevant part:

> While Fifth Third Bank respects and values the important role that the Consumer Financial Protection Bureau (CFPB) plays in protecting consumers, the allegations in the civil lawsuit brought by the CFPB against Fifth Third are unsubstantiated, based on limited, non-systemic, and remediated events, and reflect misunderstandings of our products, services, and work culture.
>
> When a federal court examines the evidence, we believe it will agree with Fifth Third that the civil suit filed today is unnecessary and unwarranted.

214.     Yet, Fifth Third admits to opening Unauthorized Accounts. Specifically, the March 2020 Fact Sheet states, "Fifth Third identified . . . 1,100 unauthorized accounts . . . opened between 2010 and 2016."   But attempts to downplay this fact under the guise that the number of Unauthorized Accounts equates to "just 0.01%" and that "[t]here is no evidence of systemic misconduct."   Moreover, the Company admits that it received "424 complaints regarding unauthorized accounts" from the same subset of accounts analyzed.

215. The March 2020 Fact Sheet continued to address each and every allegation of the CFPB Action and attempted to portray the Company in a positive light. Many of the responsive statements contained within the March 2020 Fact Sheet suggest that "[i]ncentives have always been modest", which in Fifth Third's and the Individual Defendants' opinion, is sufficient to deter unethical and unlawful situations, such as the opening of Unauthorized Accounts.

216. Similarly, the March 2020 FAQ admits to "[l]imited instances of employee misconduct". Further, the Company attempts to downplay the incentives available to retail bank employees by stating "only a small percentage [of compensation] is based on sales performance."

217. The March 9, 2020 Form 8-K, March 2020 PR, March 2020 Fact Sheet, and March 2020 FAQ were materially false and misleading because the Company and the Individual Defendants failed to disclose material facts regarding Fifth Third and the Company's business practices, operations, incentive programs, as well as Fifth Third's predatory Cross-Selling. Specifically, the Company and the Individual Defendants failed to disclose and/or provided false and/or misleading statements with regards to: (i) Company employees fraudulently opening Unauthorized Accounts; (ii) the Company incentivizing and rewarding employees and management for establishing Unauthorized Accounts; (iii) the Company and Individual Defendants being aware of the unethical and fraudulent activity surrounding the Unauthorized Accounts since at least 2008; (iv) the Company being in violation of federal and state laws and regulations designed to protect clients from instances such as Unauthorized Accounts; (v) the Company and Individual Defendants failing to implement, maintain, and oversee the Company's Cross-Selling; (vi) the Company and Individual Defendants failing to identify and mitigate misconduct associated with Cross-Selling, and failing to remediate the harm caused to consumers who were subjected to Unauthorized Accounts; (vii) as a result of (i) – (vi), the Company being

subject to a heightened level of risk and enforcement action that was not accurately or fully captured in the 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K, or 2019 Form 10-K; (viii) Fifth Third's revenue, net income, customer retention, new accounts, *inter alia*, provided a false and misleading picture of the Company's true financial status as the figures reported contained results based on unlawful and unethical conduct that is unsustainable; and (ix) as a result of (i) – (viii), Fifth Third's public statements were materially false and misleading.

218.    Furthermore, the timing of Defendant Forrest's transition and impending retirement suggests that the Company and the Individual Defendants were well aware of the impending CFPB Action months prior to the inclusion of the Company's statement regarding the CFPB's investigation in the 2019 Form 10-K. Additionally, the timing of Forrest's transition suggests the existence of officer misconduct and/or that Forrest was responsible for, an integral part of, or possessed substantial knowledge regarding the CFPB's allegations.

219.    On March 24, 2020, fifteen (15) days after the filing of CFPB Action, Fifth Third filed a Current Report on Form 8-K with the SEC (the "March 24, 2020 Form 8-K"). The March 24, 2020 Form 8-K indicates that the Company made "Amendments to Articles of Incorporation or Bylaws; Change in Fiscal Year." Specifically, the March 24, 2020 Form 8-K states, in relevant part:

> Section 17 of Article III of the Regulations was also revised to allow indemnification of employees to the fullest extent permitted by Ohio law. Lastly, a new Section 18 of Article III was added to the Regulations in order to expressly allow, with certain exceptions, the advancement of expenses (including attorney's fees) to anyone defending an action pursuant to the indemnification provisions of the Regulations.

220.    Notably, Article III of the Code of Regulations of Fifth Third Bancorp as Amended (the "Amended Regulations") is entitled "Board of Directors". Section 17 of Article III, as amended, states:

Indemnification. The Corporation shall indemnify, to the full extent permitted or authorized by applicable law, as it may from time to time be amended, any person made or threatened to be made a party to any threatened, pending, or completed action, suit, or proceeding, whether civil, criminal, administrative, or investigative, by reason of the fact that he or she is or was a director, officer, or employee of the Corporation, or is or was serving at the request of the Corporation as a director, trustee, officer, or employee of a bank, other corporation, partnership, joint venture, trust, or other enterprise. In the case of a merger into the Corporation of a constituent corporation which, if its separate existence had continued, would have been required to indemnify directors, officers, or employees in specified situations prior to the merger, any person who served as a director, officer, or employee of the constituent corporation, or served at the request of the constituent corporation as a director, trustee, officer, or employee of a bank, other corporation, partnership, joint venture, trust, or other enterprise, shall be entitled to indemnification by the Corporation (as the surviving corporation) for acts, omissions, or other events or occurrences prior to the merger to the same extent as such person would have been entitled to indemnification by the constituent corporation if its separate existence had continued. The indemnification provided by this Section shall not be deemed exclusive of any other rights to which any person seeking indemnification may be entitled under the Articles of Incorporation or this Code of Regulations, or any agreement, vote of shareholders or disinterested directors, or otherwise, both as to action in his or her official capacity and as to action in another capacity while holding such office, and shall continue as to a person who has ceased to be a director, trustee, officer, or employee and shall inure to the benefit of the heirs, executors, and administrators of such a person.

221.    Moreover, Section 18 of Article III, as amended, states:

Advancement of Expenses. To the extent permitted by applicable law, expenses (including attorneys' fees) incurred by a director subject to Section 17 in defending any action, suit or proceeding referred to in Section 17 shall be paid by the Corporation as incurred, in advance of the final disposition of such action, suit or proceeding, upon receipt by the Corporation of an undertaking by or on behalf of such director that satisfies the conditions for such advancement under Ohio law. To the extent permitted by applicable law, liabilities and expenses (including attorneys' fees) incurred by any person subject to Section 17 other than a director in defending any action, suit or proceeding referred to in Section 17 may be paid by the Corporation as incurred, in advance of the final disposition of such action, suit or proceeding, if and to the extent so determined by the Board of Directors (including pursuant to policies adopted from time to time by the Board of Directors), subject to compliance by such person with the applicable conditions for such advancement under Ohio law and any other conditions determined by the Board of Directors.

222.    The Amended Regulations, which were established a mere fourteen (14) days after

the filing of CFPB Action indicates that the Individual Defendants are acting in a manner to further and protect their own personal and financial interests.

223.    Surprisingly, while the Individual Defendants were securing their personal and financial protection with regard to indemnity and attorney's fees, Fifth Third filed a Current Report on Form 8-K with the SEC on April 14, 2020 which contained the presentation to "be made during the 2020 Annual Meeting of Shareholders of Fifth Third Bancorp" (the "April 2020 Form 8-K").

224.    The attached presentation to the April 2020 Form 8-K makes no mention of the CFPB Action or the Securities Class Action, even though the agenda indicates that a Business Update would be provided.  Instead, the presentation touts the Company's resilient balance sheet, proactive management, and diversified revenue mix.

225.    Similar to the April 2020 Form 8-K, Fifth Third's First Quarter 2020 Earnings Presentation failed to mention the CFPB Action or the Securities Class Action.  Instead, once again, the presentation touts the Company's resilient balance sheet, proactive management, and diversified revenue mix.

226.    On May 8, 2020, Fifth Third filed a Quarterly Report on Form 10-Q with the SEC for the period ended March 31, 2020 (the "1Q 2020 Form 10-Q").  The 1Q 2020 Form 10-Q states the following about the CFPB Action:

> On March 9, 2020, the CFPB filed a lawsuit against Fifth Third in the United States District Court for the Northern District of Illinois entitled CFPB v. Fifth Third Bank, National Association, Case No. 1:20-CV-01683 (N.D.Ill.) (ABW), alleging violations of the Consumer Financial Protection Act, TILA, and Truth in Savings Act related to Fifth Third's alleged opening of unspecified numbers of allegedly unauthorized credit card, savings, checking, online banking and early access accounts from 2010 through 2016. The CFPB seeks unspecified amounts of civil monetary penalties as well as unspecified customer remediation. Fifth Third believes that the facts do not warrant an enforcement proceeding and intends to defend itself vigorously in this matter.

227.    The Company also discussed the Securities Class Action in the 1Q 2020 Form 10-

Q for the first time. The 1Q 2020 Form 10-Q states the following regarding the Securities Class Action:

> On April 7, 2020, Plaintiff Lee Christakis filed a putative class action against Fifth Third Bancorp, Fifth Third President and Chief Executive Officer Greg D. Carmichael, and Fifth Third Chief Financial Officer Tayfun Tuzun in the U.S. District Court for the Northern District of Illinois entitled Lee Christakis, individually and on behalf of all others similarly situated v. Fifth Third Bancorp, et al., Case No. 1:20-cv-02176 (N.D.Ill). The case brings two claims for violation of Sections 10(b) and 20(a) of the Securities Exchange Act, alleging that the Defendants made material misstatements and omissions in connection with the alleged unauthorized opening of credit card, savings, checking, online banking and early access accounts from 2010 through 2016. The plaintiff seeks certification of a class, unspecified damages, attorney fees and costs. Fifth Third believes that the facts do not warrant litigation and intends to vigorously defend itself in this matter.

228. The Company is now subject to putative consumer class actions based on similar facts as the CFPB Action, including *Hartt v. Fifth Third Bancorp*, Docket No. 1:20-cv-00547 (S.D. Ohio Jul 14, 2020) and *Zanni v. Fifth Third Bancorp et al.*, Docket No. 1:20-cv-03407 (N.D. Ill. Jun 10, 2020)[29] (collectively, the "Consumer Class Actions").

229. The Consumer Class Actions allege that the misconduct described herein resulted in the Company violating the Ohio Consumers Sales Practices Act, the Truth In Lending Act, the Fair Credit Reporting Act, and the Electronic Funds Transfer Act.

## DAMAGES TO FIFTH THIRD CAUSED BY THE INDIVIDUAL DEFENDANTS

230. As a direct and proximate result of the Individual Defendants' misconduct, the Individual Defendants allowed for materially inadequate controls over the Company's policies and practices, caused the Company to issue materially false and misleading statements, sought to protect themselves personally and financially to the detriment of the Company, Plaintiffs, and all

---

[29] This case was originally filed in the Circuit Court for Cook County on April 29, 2020, styled as *Joanne Zanni, on behalf of herself and all other persons similarly situated, known and unknown v. Fifth Third Bancorp and Fifth Third Bank, National Association*, Cook County Case No. 2020CH04022.

other stockholders, and substantially damaged the Company's credibility, corporate image and goodwill.

231.  Fifth Third has expended and will continue to expend significant sums of money. Additional expenditures and damages that the Company has incurred as a result of the Individual Defendants' breaches of their fiduciary duty include:

a.  Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their duties to the Company;

b.  Costs incurred from investigating, defending and paying any settlement or judgment in connection with the CFPB Action;

c.  Costs incurred from investigating, defending and paying any settlement or judgment in connection with enforcement actions brought by state and federal agencies for violations of federal and state consumer protection acts;

d.  Costs incurred from investigating, defending and paying any settlement or judgment in connection with the Consumer Class Actions and other lawsuits brought on behalf of the Company's customers;

e.  Costs incurred from investigating, defending and paying any settlement or judgment in connection with the Securities Class Action; and

f.  Costs incurred from the loss of Fifth Third's customers' confidence in the Company's services.

232.  Further, Fifth Third's credibility, reputation, and goodwill have likewise been damaged, and the Company remains exposed to significant potential liability going forward.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

233.  Plaintiffs bring this action derivatively in the right and for the benefit of Fifth Third

to redress injuries suffered, and to be suffered, by Fifth Third as a direct result of the Individual Defendants' multiple breaches of fiduciary duty.

234.    Plaintiffs are shareholders of Fifth Third, were shareholders of Fifth Third during the relevant period of the wrongdoing alleged herein and have been shareholders of Fifth Third continuously since that time.

235.    Plaintiffs will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting Fifth Third's rights.

236.    Fifth Third is named as a nominal defendant in this case solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.  Prosecution of this action, independent of the current Board of Directors, is in the best interests of the Company.

237.    The wrongful acts complained of herein subject, and will continue to subject, Fifth Third to continuing harm because the adverse consequences of the actions are still in effect and ongoing.

238.    The wrongful acts complained of herein were unlawfully concealed from Fifth Third shareholders, including Plaintiffs.

239.    As a result of the facts set forth herein, Plaintiffs have not made any demand on the Board to institute this action since demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.  The wrongful acts complained of herein show multiple breaches by the Board of their fiduciary duties of loyalty, care, and good faith.

240.    At the time this action was initiated, the Board was comprised of fifteen (15) directors: Defendants Carmichael, Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister,

Williams, Akins, Bayh, Benitez, Blackburn, and Brumback, and non-parties Feiger and Clement-Holmes. For the reasons detailed herein, at least eight (8) members of the Board are incapable and unwilling to institute and vigorously prosecute this action.

241. Demand upon the Board is futile because a majority of the Board is already predisposed to refuse a demand as demonstrated by the Board's position on the merits of the allegations set forth within the CFPB Action. As aforementioned in ¶¶ 210 - 17, on March 9, 2020, the same day that the CFPB PR was issued and the CFPB Action was filed, the Company and Individual Defendants issued the March 2020 PR, March 2020 Fact Sheet, and March 2020 FAQ. The March 2020 Responses all indicate that Fifth Third "reject[s] the allegations made by the [CFPB] in a civil lawsuit."

242. Further, the March 2020 Fact Sheet boasts that "[w]hen a federal court examines the evidence, we believe it will agree with Fifth Third that the civil suit filed today is unnecessary and unwarranted."

243. All the while, each of the March 2020 Responses voluntarily admits that Fifth Third opened Unauthorized Accounts.

244. The entire Board, with the exception of non-parties Feiger and Clement-Holmes, is disqualified from fairly evaluating the derivative claims as demonstrated by the Company's and Individual Defendant's March 2020 Responses. The Board, excluding non-parties Feiger and Clement-Holmes, is further disqualified from fairly evaluating the derivative claims because they are responsible for and contributed to the damages suffered by Fifth Third.

245. The Board's failure of oversight reflects a conscious and deliberate disregard of their fiduciary duties. This constitutes bad faith. As such, the Board faces a substantial likelihood of liability, rendering demand upon them futile.

246.    Demand is additionally futile because the Board willingly supported, approved, authorized, and/or engaged in the systemic and pervasive misconduct of the Company.

247.    Demand upon members of the Company's Audit Committee (Defendants Blackburn, Harvey, Hoover, McCallister, and Mallesch, collectively referred to as "Audit Committee Defendants") would be futile.  Additionally, demand upon Defendants Daniels, Williams, Benitez, Brumback, and Burris would be futile as each defendant previously served on the Audit Committee during the alleged misconduct.  Pursuant to the Audit Committee Charter, the Audit Committee members are tasked with oversight responsibilities relating to the Company's accounting and financial reporting process and the audits of the Company's financial statements. The Audit Committee Charter specifically states, in relevant part:

The Committee's primary purposes are to:

- Oversee the accounting and financial reporting processes of the Corporation and the audits of the financial statements of the Corporation.

- Provide assistance to the Corporation's Board by monitoring:

    1.    the integrity of the financial statements of the Corporation,
    2.    the independent auditors' qualifications and independence,
    3.    the performance of the Corporation's and its subsidiaries' internal audit function and independent auditors,
    4.    the Corporation's system of internal controls, and
    5.    the Corporation's financial reporting and system of disclosure controls.

- Provide assistance to the Bank's Board by monitoring:

    1.    the integrity of the financial statements of the Bank,
    2.    the Bank's system of internal controls,
    3.    the Bank's financial reporting, and
    4.    the compliance by the Bank with applicable legal and regulatory requirements

- Prepare the Committee report required by the rules of the SEC to be included in the Corporation's annual proxy statement

248.    The Audit Committee Defendants are also responsible for oversight of independent

and internal auditors, corporation financial reporting / internal controls, bank financial reporting /

internal controls, bank trust audit, independent auditors, internal audit function, and compliance

oversight.  With specific regard to compliance oversight, the Audit Committee Charter charges the

Audit Committee Defendants with:

- Review procedures designed to identify related party transactions that are material to the financial statements or otherwise require disclosure.

- Establish procedures and require the Corporation to obtain or provide the necessary resources and mechanisms for (i) the receipt, retention and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters, and (ii) the confidential, anonymous submission by employees of the Corporation of concerns regarding questionable accounting or auditing matters.

- Discuss with management and the independent auditors any correspondence with regulators or governmental agencies and any employee complaints or published reports which raise material issues regarding the Corporation's financial statements or accounting policies.

- Discuss with the Corporation's General Counsel and Chief Risk Officer legal matters that may have a material impact on the financial statements and that may have an impact on the Corporation's compliance policies.

- Oversee the administration of the Corporation's Code of Business Conduct and establish an enforcement mechanism for the Corporation's Code of Business Conduct and Ethics.

- Consider any material waivers of the Corporation's Code of Business Conduct and recommend to the Board of Directors of the Corporation whether or not to grant such waiver.

- Receive and review reporting regarding calls to the Corporation's Ethics Line.

249.    The Audit Committee and the Audit Committee Defendants failed to adequately

perform their oversight responsibilities as required by the Audit Committee Charter.  Additionally,

based on the Audit Committee Charter, the Audit Committee Defendants were tasked with

periodically meeting with the Company's legal counsel and Chief Risk Officer, and therefore, were aware, or should have been aware, of the impending CFPB Action. Further, the Audit Committee is responsible for handling reports submitted to the Company's EthicsLine; however, as mentioned in ¶ 134, at least one employee noted that the response to reported issues on the Company's EthicsLine was non-existent or deficient and according to the CFPB there was an increase in the number of calls by employees to the EthicsLine (¶ 207).

250. As such, the Audit Committee Defendants were aware or should have been aware of the potential misconduct occurring at the Company by 2011, at the latest. Additionally, the Audit Committee Defendants "[r]eport to the full Board of Directors on the Committee's activities at each meeting of the Board of Directors of the Corporation and the Bank." Therefore, the Audit Committee Defendants had the duty to inform the entire Board of the misconduct reported to the Company's EthicsLine. As a result, each member of the Board was aware, should have been aware, or recklessly ignored the misconduct occurring within the Company.

251. Moreover, the Audit Committee and the Audit Committee Defendants were responsible for assisting the Board with the Company's financial statements, reporting, disclosures, and the application of legal and regulatory requirements. The Audit Committee Defendants once again failed to perform their responsibilities as required by the Audit Committee Charter, as the Audit Committee Defendants permitted the Company and remaining Individual Defendants to issue materially false and/or misleading SEC filings. As a result, the Audit Committee Defendants (Blackburn, Harvey, Hoover, McCallister, and Mallesch) face a substantial likelihood of liability for their breaches of fiduciary duties. Additionally, Defendants Daniels, Williams, Benitez, Brumback, and Burris face a substantial likelihood of liability for their breaches of fiduciary duties as the misconduct complained of herein occurred during their prior service on

the Audit Committee.

252. Demand upon members of the Company's Risk and Compliance Joint Committee (Defendants Brumback, Daniels, Heminger, Hoover, and Mallesch, collectively the "Risk Committee Defendants") would be futile. Pursuant to the Risk and Compliance Joint Committee Charter, the Risk Committee Defendants are tasked with oversight responsibilities relating to the "risk management policies of the Corporation's and the Bank's global operation and oversight of its global risk management framework." Specifically, the Risk and Compliance Joint Committee Charter states, in relevant part:

In furtherance of this function, the Committee shall:

- Oversee management's compliance with all of Fifth Third's regulatory obligations arising under applicable federal and state banking laws, rules and regulations;

- Oversee management's development and implementation of the global Risk Management Framework ("Framework"), inclusive of the risk appetite, with an enterprise view of risk capacity, risk tolerances, risk limits, and key risk indicators which are integral components of the Framework. In addition, the Framework includes consistent processes for identifying, assessing, managing, monitoring and reporting risks of all types, including the categories of credit risk, market risk, liquidity risk, operational risk, regulatory compliance risk, legal risk, reputation risk and strategic risk;

*     *     *

- Ensure that risk processes are supported by a risk governance structure that includes oversight by the Boards of Directors of the Corporation and the Bank, policies, risk limits, and risk committees, and further by a culture that supports risk management objectives and reflects appropriate accountability by all lines of defense.

- Oversee the Company's supervisory issues and enforcement actions and the Corporation's efforts to remediate them.

*     *     *

5. Operational Risk

- Develop and maintain an Operational Risk Management Policy (the "OR Policy"), which shall be discussed by the Committee with management.

Following such discussion, and after taking into consideration any matters as the Committee may deem advisable and appropriate, including management's recommendation, the Committee shall annually recommend the OR Policy to the Boards of Directors of the Corporation and the Bank for approval. In addition, the Committee may authorize management to develop and implement any additional detailed policies and procedures relating to operational risk as may be consistent with the OR Policy.

- Review management reports relating to operational risk issues in areas including but not limited to: fraud; development of material products and services; execution, delivery and process management; acquisition integration issues; technology risks and technology strategies; cybersecurity incidents and privacy breaches; business disruption and system failures; and business practices generally.

6. <u>Legal Risk</u>

- Management shall develop and maintain a Legal Risk Management Policy (the "Legal Risk Policy"), which policy shall be discussed by the Committee with management. Following such discussion, and after taking into consideration any matters as the Committee may deem advisable and appropriate, including management's recommendation, the Committee shall annually recommend the Legal Risk Policy to the Boards of Directors of the Corporation and the Bank for approval. In addition, the Committee may authorize management to develop and implement any additional detailed policies and procedures relating to legal risk as may be consistent with the Legal Risk Policy.

- Review management reports relating to legal risk issues in areas including but not limited to: material litigation, legal settlements and defense complaints.

7. <u>Reputation Risk</u>

- Management shall develop and maintain a Reputation Risk Management Policy (the "RR Policy"), which policy shall be discussed by the Committee with management. Following such discussion, and after taking into consideration any matters as the Committee may deem advisable and appropriate, including management's recommendation, the Committee shall annually recommend the RR Policy to the Boards of Directors of the Corporation and the Bank for approval. In addition, the Committee may authorize management to develop and implement any additional detailed policies and procedures relating to reputation risk as may be consistent with the RR Policy.

- Review management reports relating to reputation risk issues in areas including but not limited to: customer complaint trends, corporate reputation, and media tracking.

253.    Moreover, according to the Company's 2019 10-K

Fifth Third also focuses on the reporting and escalation of operational control issues to senior management and the Board of Directors. The Operational Risk Committee is the key committee that oversees and supports Fifth Third in the management of operational risk across the enterprise. The Operational Risk Committee reports to the ERMC, which reports to the Risk and Compliance Joint Committee of the Board of Directors of Fifth Third Bancorp and Fifth Third Bank, National Association.

254.    The Risk Committee Defendants failed to adequately perform their oversight responsibilities as required by the Risk and Compliance Joint Committee Charter. Additionally, based on the Company's Risk and Compliance Joint Committee Charter, the Risk Committee Defendants were aware, should have been aware, or willfully ignored the Company's regulatory violations with regard to the Unauthorized Accounts and/or predatory nature of Fifth Third Bank employees and management.

255.    Furthermore, the Risk and Compliance Joint Committee and the Risk Committee Defendants were responsible for addressing and overseeing the Company's operational risk, legal risk, and reputational risk. The Risk Committee again failed to perform their responsibilities as required by the Risk and Compliance Joint Committee Charter as the Risk Committee Defendants permitted the Company to allegedly violate federal and state banking laws, rules, and regulations, and similarly, failed to ensure that reported instances of misconduct were adequately addressed and remediated to prevent reputational harm. As a result, the Risk Committee Defendants (Brumback, Daniels, Heminger, Hoover, and Mallesch) face a substantial likelihood of liability for their breaches of fiduciary duties.

256.    Demand upon members of the Company's Finance Joint Committee (Defendants Heminger, Akins, Benitez, Brumback, McCallister, and Williams, collectively the "Finance Committee Defendants") would be futile. Pursuant to the Finance Joint Committee Charter, the Finance Committee Defendants are empowered with the ability "to exercise, during the intervals

between the meetings of the Board of Directors, all the powers of the Board of Directors of the Corporation and the Bank in the management of the business, properties and affairs of the Corporation and the Bank that may be permissibly exercised by a committee thereof."

257. The Company's Finance Joint Committee Charter, permits the Finance Committee Defendants to act on behalf of the Board and utilize powers given to other committees. As such, the Finance Committee Defendants failed to perform their responsibilities required by the Finance Joint Committee Charter as the Finance Committee Defendants failed to address the Company's alleged violations of federal and state banking laws, rules, and regulations, and similarly failed to ensure that reported instances of misconduct were adequately addressed and remediated. As a result, the Finance Committee Defendants (Defendants Heminger, Akins, Benitez, Brumback, Mallesch, McCallister, and Williams) face a substantial likelihood of liability for their breach of fiduciary duties.

258. Demand upon members of the Company's Human Capital and Compensation Committee (Defendants McCallister, Brumback, Heminger, Williams, and Mallesch, collectively the "Compensation Committee Defendants") would be futile. Pursuant to the Human Capital and Compensation Committee Charter:

The Committee's primary purposes are to:

- Discharge the Corporation's responsibilities relating to the compensation of the Corporation's Executive Officers. The Committee has overall responsibility for overseeing the benefit, bonus, incentive compensation, severance, equity-based or other compensation plans, policies and programs of the Corporation and its subsidiaries.

- **Oversee management's development and implementation of the incentive compensation strategy for the Corporation.**

- **Oversee the incentive compensation plans, policies and programs encompassing those employees of the Corporation and its subsidiaries who,**

**either individually or as part of a group, have the ability to expose the Corporation to material risk ("Covered Employees").**

- Implement Chief Executive Officer ("CEO") succession planning.

- Make recommendations regarding director compensation to the Board of Directors.

- Prepare the annual report on executive compensation for inclusion in the Corporation's proxy statement, including review and discussion of the Compensation Discussion & Analysis with Management and disclosure of whether the Committee has retained or obtained the advice of a compensation consultant and if the work of the compensation consultant has raised any conflict of interest and, if so, the nature of the conflict and how it is being addressed.

(Emphasis added).

259.    Additionally, the Human Capital and Compensation Committee is responsible for executive compensation/approval of transactions, as well as risk and compliance oversight with regard to the Company's incentive compensation strategy.

260.    The Human Capital and Compensation Committee and the Compensation Committee Defendants failed to adequately perform their oversight responsibilities as required by the Human Capital and Compensation Committee Charter.  Additionally, based on the Company's Human Capital and Compensation Committee Charter, the Compensation Committee Defendants drafted, approved, and supported the questionable incentive-based compensation as alleged in this Complaint, the CFPB Action, and the Securities Class Action.  Further, the Compensation Committee Defendants determined, should have determined, or willfully ignored the risk of potential harm to the Company through Fifth Third's incentive-based compensation structure. Moreover, the Compensation Committee Defendants failed to

- Identify and limit features of:

  a. Executive Officer compensation plans that could lead the officer to take unnecessary and excessive risks;

b. Employee compensation plans that pose risks to ensure the Corporation is not unnecessarily exposed to risk; and

c. Both Executive Officer and employee compensation plans that encourage behavior focused on short-term results rather than long-term value creation.

261. As such, the Human Capital and Compensation Committee failed to perform their responsibilities as required by the Human Capital and Compensation Committee Charter. Therefore, the Compensation Committee Defendants (McCallister, Brumback, Heminger, Williams, and Mallesch) face a substantial likelihood of liability for their breaches of fiduciary duties.

262. Demand upon members of the Company's Nominating and Corporate Governance Committee (Defendants Akins, Bayh, Benitez, Blackburn, Harvey, and Williams, collectively the "Corporate Governance Committee Defendants") would be futile. Pursuant to the Company's Nominating and Corporate Governance Committee:

The Committee's primary purposes are to:

- Develop and recommend to the Board of Directors corporate governance policies and guidelines for the Corporation and for identifying and nominating director and committee member candidates; and

- Nominate directors for election to the Board of Directors and recommend appointment to committee membership.

263. Additionally, the Corporate Governance Committee Defendants are responsible for annually reviewing:

the corporate governance policies of the Corporation, including Corporate Governance Guidelines, and Code of Business Conduct and Ethics and the Government Affairs Policy, to ensure that they are appropriate for the Corporation and comply with applicable laws, regulations and listing standards, and to recommend any desirable changes to the Board of Directors.

264. The Corporate Governance Committee Defendants failed to act in good faith in the performance of their responsibilities outlined in the Nominating and Corporate Governance

Committee Charter. The Corporate Governance Committee Defendants were aware, should have been aware, or willfully ignored the allegations contained within this Complaint, the CFPB Action, and the Securities Class Action; yet, the Corporate Governance Committee Defendants continued to nominate the same set of directors for service on the Board. The lack of action by the Corporate Governance Committee Defendants permitted the aforementioned allegations and harm to perpetually continue. As a result, the Corporate Governance Committee Defendants (Defendants Akins, Bayh, Benitez, Blackburn, Harvey, and Williams) face a substantial likelihood of liability for their breaches of fiduciary duties.

265. As admitted by Fifth Third in the March 2020 Responses, the Company was aware of over 1,000 Unauthorized Accounts opened between 2010 and 2016. Additionally, as alleged in ¶ 137, Fifth Third internally tracked purported cases of "gaming," which more likely than not directly relate to the Unauthorized Accounts. Despite being put on notice, internally tracking "gaming," and receiving 424 complaints regarding unauthorized accounts, the Board failed to address, rectify, and remediate the issues surrounding the Unauthorized Accounts and has demonstrated an unwillingness to act.

266. Furthermore, the Board's intentional and knowing failure to make proper and/or complete disclosures and concerted effort to conceal facts from the public at large demonstrates that demand upon the Board would be a futile and useless act.

267. Demand upon the Director Defendants (defined below) would be futile. As aforementioned, the unlawful conduct complained of herein has been perpetuated for over a decade at Fifth Third. The Director Defendants are or should be on notice of the unlawful conduct; however, the Director Defendants have either failed or willfully ignored the need for corrective action, causing a demand upon the Director Defendants to be futile.

268.     Fifth Third has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Board has not filed any lawsuits against themselves or the other Individual Defendants to attempt to recover for the Company any part of the damages that the Company suffered and will continue to suffer thereby.  Thus, any demand upon the board would be futile.

269.     The Board is composed of nine (9) longstanding directors who were members of the Board when the misconduct described herein was occurring: Heminger (director since 2006), Williams (director since 2008), Hoover (director since 2009), Brumback (director since 2009), McCallister (director since 2011), Bayh (director since 2011), Akins (director since 2013), Blackburn (director since 2014), and Benitez (director since 2015).  These directors were on notice, or should have been on notice, of the issues involving the Unauthorized Accounts and other misconduct.

270.     In addition to the above, for the following reasons demand upon **Defendant Carmichael** would be futile.  Carmichael serves as the Company's Chairman, CEO, and President, and therefore, as conceded by the Company, he is not independent.  Further, Carmichael is named as a defendant in the Securities Class Action.  Carmichael is responsible for and signed the false and misleading 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K and 2019 Form 10-K, as well as the respective SOX certifications.  Therefore, Carmichael is not independent and cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

271.     In addition to the above, for the following reasons demand upon **Defendant Daniels** would be futile.  Daniels serves on the Company's Risk and Compliance Committee, as well as the Technology Committee.  Previously, Daniels served on the Company's Audit Committee, as such Daniels was aware or should have been aware of the misconduct alleged herein

and failed to effectively remediate the damage caused to the Company. Prior to joining the Company's Board, Daniels served as a director of MB Financial and upon Fifth Third's acquisition of MB Financial Daniels was appointed to the Board. Further, Daniels cannot disinterestedly consider a demand made with regard to Defendant Harvey or non-party Feiger due to their prior relationship at MB Financial. All three (Daniels, Harvey, and Feiger) served at MB Financial prior to the merger with the Company, and all three have been appointed to the Board of Fifth Third as a result. Daniels is the co-founder and principal of Prairie Capital, a private equity firm, that has done business with MB Financial and Fifth Third. Moreover, Daniels beneficially owns 208,324 shares of the Company's common stock and, in 2019, received $176,075 in compensation. Daniels signed the 2019 Form 10-K that contained false and misleading statements. Therefore, Daniels cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

272. In addition to the above, for the following reasons, demand upon **Defendant Harvey** would be futile. Harvey serves on the Company's Audit Committee, Nominating and Corporate Governance Committee, and Technology Committee. Previously, Harvey served on the Company's Risk and Compliance Committee. Harvey was aware or should have been aware of the misconduct alleged herein and failed to effectively remediate the damage caused to the Company. Prior to joining the Company's Board, Harvey served as a chairman of MB Financial and upon Fifth Third's acquisition of MB Financial Harvey was appointed to the Board. Further, Harvey cannot disinterestedly consider a demand made with regard to Defendant Daniels or non-party Feiger due to their prior relationship at MB Financial. All three (Daniels, Harvey, and Feiger) served at MB Financial prior to the merger with the Company, and all three have been appointed to the Board of Fifth Third as a result. Moreover, Harvey beneficially owns 188,968 shares of the Company's common stock, and in 2019, received $176,075 in compensation. Harvey

signed the 2019 Form 10-K that contained false and misleading statements. Therefore, Harvey cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

273. In addition to the above, for the following reasons, demand upon **Defendant Heminger** would be futile. Heminger serves as chairman of the Finance Committee and serves on the Human Capital and Compensation Committee, as well as the Risk and Compliance Committee. Previously, Heminger served on the Nominating and Corporate Governance Committee. Heminger was aware or should have been aware of the misconduct alleged herein and failed to effectively address, respond to, and remediate the damage caused to the Company in accordance with his fiduciary duties. Further, Heminger cannot disinterestedly consider a demand made with regard to Defendant Bayh. Heminger is CEO and Chair of Marathon Petroleum Corporation and Defendant Bayh previously served on Marathon Petroleum Corporation's board. Moreover, Heminger beneficially owns 76,502 shares of the Company's common stock and, in 2019, Heminger received $265,000 in compensation. Heminger signed the false and misleading 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K and 2019 Form 10-K. Therefore, Heminger cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

274. In addition to the above, for the following reasons, demand upon **Defendant Hoover** would be futile. Hoover serves on the Company's Audit Committee, as well as the Risk and Compliance Committee. Previously, Hoover served as the chairwoman of the Risk and Compliance Committee, and also served on the Finance Committee. Hoover was aware or should have been aware of the misconduct alleged herein and failed to address, respond to, and remediate the damage caused to the Company in accordance with her fiduciary duties. Moreover, Hoover beneficially owns 57,976 shares of the Company's common stock and, in 2019, received $265,000 in compensation. Hoover signed the false and misleading 2016 Form 10-K, 2017 Form 10-K,

2018 Form 10-K and 2019 Form 10-K. Therefore, Hoover cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

275. In addition to the above, for the following reasons demand upon **Defendant Mallesch** would be futile. Mallesch serves as the chairwoman of the Company's Audit Committee, and serves on the Finance Committee, Human Capital and Compensation Committee, and Risk and Compliance Committee. Mallesch was aware or should have been aware of the misconduct alleged herein and failed to address, respond to, and remediate the damage caused to the Company in accordance with her fiduciary duties. Further, Mallesch cannot disinterestedly consider a demand made with regard to Defendants Carmichael and Burris. Mallesch previously served as CFO at General Electric ("GE"), Burris held numerous management positions with GE for nearly twenty (20) years, and Carmichael held multiple leadership roles with GE. Moreover, Mallesch beneficially owns 23,541 shares of the Company's common stock and, in 2019, received $220,000 in compensation. Mallesch signed the false and misleading 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K and 2019 Form 10-K. Therefore, Mallesch cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

276. In addition to the above, for the following reasons demand upon **Defendant McCallister** would be futile. McCallister serves as chairman of the Human Capital and Compensation Committee, and also serves on the Finance Committee and the Audit Committee. McCallister was aware or should have been aware of the misconduct alleged herein and failed to address, respond to, and remediate the damage caused to the Company in accordance with his fiduciary duties. Moreover, McCallister beneficially owns 59,566 shares of the Company's common stock and, in 2019, received $235,000 in compensation. McCallister signed the false and misleading 2015 Form 10-K, 2017 Form 10-K, 2018 Form 10-K and 2019 Form 10-K. Therefore,

McCallister cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

277.    In addition to the above, for the following reasons demand upon **Defendant Williams** would be futile.  Williams serves on the Company's Finance Committee, Human Capital and Compensation Committee, and Nominating and Corporate Governance Committee. Previously, Williams served on the Company's Audit Committee, as well as the Risk and Compliance Committee.  Williams was aware or should have been aware of the misconduct alleged herein and failed to address, respond to, and remediate the damage caused to the Company in accordance with her fiduciary duties.  Moreover, Williams beneficially owns 77,508 shares of the Company's common stock and, in 2019, received $300,000 in compensation.  Williams signed the false and misleading 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, and 2019 Form 10-K. Therefore, Williams cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

278.    In addition to the above, for the following reasons demand upon **Defendant Akins** would be futile.   Akins serves as chairman of the Company's Nominating and Corporate Governance Committee and is a member of the Company's Finance Committee and Technology Committee.   Previously, Akins served on the Company's Human Capital and Compensation Committee.  Akins was aware or should have been aware of the misconduct alleged herein and failed to address, respond to, and remediate the damage caused to the Company in accordance with his fiduciary duties.  Moreover, Akins beneficially owns 38,494 shares of the Company's common stock and, in 2019, received $230,000 in compensation.  Akins signed the false and misleading 2015 Form 10-K, 2017 Form 10-K, and 2019 Form 10-K.  Therefore, Akins cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

279.    In addition to the above, for the following reasons demand upon **Defendant Bayh**

would be futile. Bayh serves on the Company's Nominating and Corporate Governance Committee, as well as the Technology Committee. Bayh previously served on the Company's Risk and Compliance Committee. Bayh was aware or should have been aware of the misconduct alleged herein and failed to address, respond to, and remediate the damage caused to the Company in accordance with his fiduciary duties. Further, Bayh cannot disinterestedly consider a demand made with regard to Defendant Heminger. Defendant Bayh previously served on the board of Marathon Petroleum Corporation and Heminger is CEO and Chair of Marathon Petroleum Corporation. Moreover, Bayh beneficially owns 23,981 shares of the Company's common stock and, in 2019, received $220,000 in compensation. Bayh signed the false and misleading 2015 Form 10-K, 2017 Form 10-K, 2018 Form 10-K and 2019 Form 10-K. Therefore, Bayh cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

280. In addition to the above, for the following reasons demand upon **Defendant Benitez** would be futile. Benitez serves as the chairman of the Company's Technology Committee and serves on the Company's Finance Committee and the Nominating and Corporate Governance Committee. Previously, Benitez served on the Company's Audit Committee and the Risk and Compliance Committee. Benitez was aware or should have been aware of the misconduct alleged herein and failed to address, respond to, and remediate the damage caused to the Company in accordance with his fiduciary duties. Moreover, Benitez beneficially owns 26,856 shares of the Company's common stock and, in 2019, received $230,000 in compensation. Benitez signed the false and misleading 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K and 2019 Form 10-K. Therefore, Benitez cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

281. In addition to the above, for the following reasons demand upon **Defendant**

**Blackburn** would be futile. Blackburn serves on the Company's Audit Committee and the Nominating and Corporate Governance Committee. Previously, Blackburn served on the Company's Risk and Compliance Committee. Blackburn was aware or should have been aware of the misconduct alleged herein and failed to address, respond to, and remediate the damage caused to the Company in accordance with her fiduciary duties. Further, Blackburn's appointment to the Board occurred in 2014 which coincides with a five (5) year contract extension with the Cincinnati Bengals worth $7.9 million. Blackburn serves as the Executive Vice President of the Cincinnati Bengals and is deriving a direct benefit from Fifth Third. Moreover, Blackburn beneficially owns 111,734 shares of the Company's common stock and, in 2019, received $220,000 in compensation. Blackburn signed the false and misleading 2015 Form 10-K, 2016 Form 10-K, 2017 Form 10-K, 2018 Form 10-K and 2019 Form 10-K. Therefore, Blackburn cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

282. In addition to the above, for the following reasons demand upon **Defendant Brumback** would be futile. Brumback serves as the chairman of the Company's Risk and Compliance Committee, and serves on the Company's Finance Committee and the Human Capital and Compensation Committee. Previously, Brumback served as the chairman of the Audit Committee and served on the Finance Committee. Brumback was aware or should have been aware of the misconduct alleged herein and failed to address, respond to, and remediate the damage caused to the Company in accordance with his fiduciary duties. Moreover, Brumback beneficially owns 66,471 shares of the Company's common stock and, in 2019, received $255,000 in compensation. Therefore, Brumback cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

283. In addition to the above, for the following reasons demand upon **non-party Feiger**

would be futile. Feiger was appointed to the Board on June 15, 2020. Prior to his appointment, Feiger was the CEO of MB Financial, and once acquired by Fifth Third, Feiger served as Chairman and CEO of Fifth Third Bank (Chicago). The Company intends to recommend Feiger to the Nominating and Corporate Governance Committee. Feiger's previous position at MB Financial overlaps with Defendants Daniels and Harvey. As aforementioned, upon Fifth Third's acquisition of MB Financial, Harvey and Daniels were appointed to the Board, and now Feiger has received the same appointment. Further, Feiger cannot disinterestedly consider a demand made with regard to Defendant Harvey or Daniels due to their prior relationship at MB Financial. All three (Daniels, Harvey, and Feiger) served at MB Financial prior to the merger with the Company, and all three have been appointed to the Board of Fifth Third as a result. Moreover, according to a SEC Form 4 filed on June 16, 2020, Feiger beneficially owns 586,715 shares of the Company's common stock. The amount of Feiger's holding significantly dwarfs the other members of the Board. Therefore, Feiger cannot disinterestedly consider a demand and faces a substantial likelihood of liability.

284.    As described, many members of the Board have longstanding business and personal relationships with each other precluding them from acting independently and in favor of or support of shareholders' interests.

285.    The Board's conduct described herein and summarized above demonstrates a pattern of misconduct that could not have been the product of legitimate business judgment, as it was based on intentional, reckless, grossly negligent, and disloyal misconduct. The Board's misconduct – through both their intentional actions and conscious inaction – was in bad faith and breached their duty of loyalty. Thus, none of the Board can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).

286.    As a majority of the Board faces a substantial likelihood of liability, they are self-interested in the conduct, policies, and procedures complained of herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the Company.

287.    Furthermore, Demand upon the Board is futile because a majority of the Board has demonstrated that their personal and financial interests are superior to those of Fifth Third.  As aforementioned, a mere two (2) weeks after the filing of the CFPB Action the Individual Defendants authorized the Amended Regulations which fully indemnified the Individual Defendants to the fullest extent permitted by law.

288.    Additionally, the Amended Regulations authorized and adopted by the Individual Defendants permit the Individual Defendants, as well as other executives and employees, to receive advanced expense payments on their behalf, including expenses related to attorney's fees.

289.    The Amended Regulations approved by the Individual Defendants demonstrates that the Board and certain executive officers are not acting in the best interests of Fifth Third, and instead are elevating their own interests above the interests of the Company.  As such demand upon the Board is futile.

290.    The Board may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors and officers liability insurance if they caused the Company to purchase it for their protection with corporate funds.  If there is a directors and officers liability insurance policy covering the Board, it may contain a provision that eliminates coverage for any action brought directly by the Company against the Board, known as the "insured-versus-insured exclusion."  As a result, if the Board was to sue themselves or certain of the officers of the Company, there would be no directors and officers

insurance protection. Accordingly, the Board cannot be expected to bring such a suit. Alternatively, if the suit is brought derivatively, such an insurance policy will provide a basis for the Company to effectuate a recovery.

291. If there is no directors and officers liability insurance, the Board will not instruct Fifth Third to sue the Individual Defendants, including themselves, because they would face a large uninsured individual liability if they did. Consequently, demand would also be futile.

292. Based on the foregoing, the Board faces a sufficiently substantial likelihood of liability and, accordingly, there is a reasonable doubt as to each Board member's disinterestedness in deciding whether pursuing legal action would be in the Company's best interest. Additionally, the Board has repeatedly failed to act and have shown their unwillingness to address the Unauthorized Accounts, and the illegitimate and unethical practices employed by Fifth Third, which indicates that demand upon the Director Defendants is futile. Accordingly, demand upon the Director Defendants is excused as being futile.

## CAUSES OF ACTION

### COUNT I

**(Against Defendant Carmichael for Breach of Fiduciary Duty)**

293. Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

294. Defendant Carmichael owed and owes Fifth Third fiduciary obligations, including the obligations of good faith, loyalty, and care. Among other things, Defendant Carmichael owed and owes a fiduciary duty to Fifth Third to disseminate accurate, truthful, and complete information to the Company's shareholders.

295. Defendant Carmichael has a duty to Fifth Third and its shareholders to prudently

supervise, manage, and control the operations, business and internal financial accounting, and disclosures of the Company.

296.    As alleged herein, Defendant Carmichael had and has a fiduciary duty to, among other things, exercise good faith to ensure that the Company's business practices were maintained in good faith and, when put on notice of problems with the Company's business practices and operations by customers, state officials and regulators, and other members of the public, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

297.    Defendant Carmichael breached his duties of loyalty, care, and good faith by: (i) failing to implement and enforce a system of effective internal controls and procedures; (ii) failing to exercise their oversight duties by not monitoring the Company's compliance with state and federal laws and the Company's internal policies and procedures; (iii) consciously disregarding and failing to ensure that the Company was following proper sales practices, resulting in the commencement of the CFPB Action and the Securities Class Action; (iv) failing to fully, fairly, and timely disclose the scope and impact of the improper sales practices taught to and used by the Company's employees and managers; (v) failing to timely take corrective action to reduce and/or eliminate the illegal sales practices taught to and used by the Company's employees and managers; (vi) failing to revise the Company's incentive pay structure to reduce the likely hood of employees and managers engaging in unlawful sales practices; (vii) making and/or causing the Company to make false and misleading statements and/or material omissions resulting in the commencement of the Securities Class Action; (viii) allowing the Company to violate multiple federal and state laws and regulations; (ix) failing to take appropriate remedial action when the Board knew, or should have known, that there was pervasive misconduct at the Company; (x) failing to act in the best interests of the Company and instead acting for their own self-interest;

and (xi) consciously causing substantial damage to the Company's credibility, corporate image, and goodwill.

298.    Defendant Carmichael's actions could not have been a good faith exercise of prudent business judgment.

299.    Defendant Carmichael had actual or constructive knowledge that the Company issued materially false and misleading statements, and he failed to correct the Company's public statements and representations or, in the alternative, cause the corrections to be issued by another director or officer of Fifth Third.    Defendant Carmichael had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that Defendant Carmichael failed to ascertain and to disclose such facts even though such facts were readily available.    Such material misrepresentations and omissions were committed knowingly or recklessly.

300.    Defendant Carmichael had actual or constructive knowledge that the Company was engaging in the practices as set forth herein, and that internal controls and procedures were not adequately maintained and applied.

301.    As a direct and proximate result of Defendant Carmichael's foregoing breaches of his fiduciary duties, the Company has suffered and will continue to suffer significant damages, as alleged herein.    As a result of the misconduct alleged herein, Defendant Carmichael is liable to the Company.

302.    Defendant Carmichael's misconduct – through both his actions and conscious inaction – cannot be exculpated.

303.    Plaintiffs, on behalf of Fifth Third, have no adequate remedy at law.

## COUNT II

**(Against Defendants Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, Akins, Bayh, Benitez, Blackburn, Brumback, and Burris ("Director Defendants") for Breach of Fiduciary Duty)**

304.     Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

305.     The Director Defendants owed and owe Fifth Third fiduciary obligations, including the obligations of good faith, loyalty, and care.  Among other things, the Director Defendants owed and owe a fiduciary duty to Fifth third to disseminate accurate, truthful, and complete information to the Company's shareholders.

306.     The Director Defendants have a duty to Fifth Third and its shareholders to prudently supervise, manage, and control the operations, business and internal financial accounting, and disclosures of the Company.

307.     As alleged herein, the Director Defendants had and have a fiduciary duty to, among other things, exercise good faith to ensure that the Company's business practices were maintained in good faith and, when put on notice of problems with the Company's business practices and operations by customers, state officials and regulators, and other members of the public, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

308.     The Director Defendants breached their duties of loyalty, care and good faith by: (i) failing to implement and enforce a system of effective internal controls and procedures; (ii) failing to exercise their oversight duties by not monitoring the Company's compliance with state and federal laws and the Company's internal policies and procedures; (iii) consciously disregarding and failing to ensure that the Company was following proper sales practices, resulting in the commencement of the CFPB Action and the Securities Class Action; (iv) failing to fully,

fairly, and timely disclose the scope and impact of the improper sales practices taught to and used by the Company's employees and managers; (v) failing to timely take corrective action to reduce and/or eliminate the illegal sales practices taught to and used by the Company's employees and managers; (vi) failing to revise the Company's incentive pay structure to reduce the likely hood of employees and managers engaging in unlawful sales practices; (vii) making and/or causing the Company to make false and misleading statements and/or material omissions resulting in the commencement of the Securities Class Action; (viii) allowing the Company to violate multiple federal and state laws and regulations; (ix) failing to take appropriate remedial action when the Board knew, or should have known, that there was pervasive misconduct at the Company; (x) failing to act in the best interests of the Company and instead acting for their own self-interest; and (xi) consciously causing substantial damage to the Company's credibility, corporate image, and goodwill.

309. The Director Defendants' actions could not have been a good faith exercise of prudent business judgment.

310. The Director Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements and failed to correct the Company's public statements and representations or, in the alternative, cause the corrections to be issued by another director or officer of Fifth Third. The Director Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that the Director Defendants failed to ascertain and to disclose such facts even though such facts were readily available. Such material misrepresentations and omissions were committed knowingly or recklessly.

311. The Director Defendants had actual or constructive knowledge that the Company

was engaging in the practices as set forth herein, and that internal controls and procedures were not adequately maintained and applied.

312.     As a direct and proximate result of the Director Defendants' foregoing breaches of their fiduciary duties, the Company has suffered and will continue to suffer significant damages, as alleged herein.  As a result of the misconduct alleged herein, Director Defendants are liable to the Company.

313.     The Director Defendants' misconduct – through both their actions and conscious inaction – cannot be exculpated.

314.     Plaintiffs, on behalf of Fifth Third, have no adequate remedy at law.

## COUNT III

**(Against Defendants Tuzun and Forrest ("Officer Defendants") for Breach of Fiduciary Duty)**

315.     Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

316.     The Officer Defendants owed and owe Fifth Third fiduciary obligations, including the obligations of good faith, loyalty, and care.  Among other things, the Officer Defendants owed and owe a fiduciary duty to Fifth Third to disseminate accurate, truthful, and complete information to the Company's shareholders.

317.     The Officer Defendants have a duty to Fifth Third and its shareholders to prudently supervise, manage, and control the operations, business and internal financial accounting, and disclosures of the Company.

318.     As alleged herein, the Officer Defendants had and have a fiduciary duty to, among other things, exercise good faith to ensure that the Company's business practices were maintained in good faith and, when put on notice of problems with the Company's business practices and

operations by customers, state officials and regulators, and other members of the public, exercise

good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

319. The Officer Defendants breached their duties of loyalty, care and good faith by:

(i) failing to implement and enforce a system of effective internal controls and procedures;

(ii) failing to exercise their oversight duties by not monitoring the Company's compliance with

state and federal laws and the Company's internal policies and procedures; (iii) consciously

disregarding and failing to ensure that the Company was following proper sales practices, resulting

in the commencement of the CFPB Action and the Securities Class Action; (iv) failing to fully,

fairly, and timely disclose the scope and impact of the improper sales practices taught to and used

by the Company's employees and managers; (v) failing to timely take corrective action to reduce

and/or eliminate the illegal sales practices taught to and used by the Company's employees and

managers; (vi) failing to revise the Company's incentive pay structure to reduce the likely hood of

employees and managers engaging in unlawful sales practices; (vii) making and/or causing the

Company to make false and misleading statements and/or material omissions resulting in the

commencement of the Securities Class Action; (viii) allowing the Company to violate multiple

federal and state laws and regulations; (ix) failing to take appropriate remedial action when the

Board knew, or should have known, that there was pervasive misconduct at the Company;

(x) failing to act in the best interests of the Company and instead acting for their own self-interest;

and (xi) consciously causing substantial damage to the Company's credibility, corporate image,

and goodwill.

320. The Officer Defendants' actions could not have been a good faith exercise of

prudent business judgment.

321. The Officer Defendants had actual or constructive knowledge that the Company

issued materially false and misleading statements and failed to correct the Company's public statements and representations or, in the alternative, cause the corrections to be issued by another director or officer of Fifth Third.   The Officer Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that The Officer Defendants failed to ascertain and to disclose such facts even though such facts were readily available.   Such material misrepresentations and omissions were committed knowingly or recklessly.

322.    The Officer Defendants had actual or constructive knowledge that the Company was engaging in the practices as set forth herein, and that internal controls and procedures were not adequately maintained and applied.

323.    As a direct and proximate result of the Officer Defendants foregoing breaches of his fiduciary duties, the Company has suffered and will continue to suffer significant damages, as alleged herein.   As a result of the misconduct alleged herein, the Officer Defendants are liable to the Company.

324.    The Officer Defendants' misconduct – through both their actions and conscious inaction – cannot be exculpated.

325.    Plaintiffs, on behalf of Fifth Third, have no adequate remedy at law.

## COUNT IV

### (Against Defendant Carmichael for Unjust Enrichment)

326.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

327.    Through the wrongful course of conduct and actions complained of herein, Defendant Carmichael was unjustly enriched at the expense of, and to the detriment to, Fifth Third.

The wrongful conduct was continuous and resulted in ongoing harm to the Company. Defendant Carmichael was unjustly enriched pursuant to receiving compensation and director remuneration.

328.    Plaintiffs, as shareholders of Fifth Third, seeks restitution from Defendant Carmichael, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendant Carmichael from his wrongful course of conduct and fiduciary breaches.

329.    By reason of the foregoing, Fifth Third has sustained and continues to sustain damages.

330.    Plaintiffs, on behalf of Fifth Third, have no adequate remedy at law.

## COUNT V

**(Against the Director Defendants (Daniels, Harvey, Heminger, Hoover, Mallesch, McCallister, Williams, Akins, Bayh, Benitez, Blackburn, Brumback, and Burris) for Unjust Enrichment)**

331.    Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

332.    Through the wrongful course of conduct and actions complained of herein, the Director Defendants were unjustly enriched at the expense of, and to the detriment to, Fifth Third. The wrongful conduct was continuous and resulted in ongoing harm to the Company. The Director Defendants were unjustly enriched pursuant to receiving compensation and director remuneration.

333.    Plaintiffs, as shareholders of Fifth Third, seek restitution from the Director Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by the Director Defendants from their wrongful course of conduct and fiduciary breaches.

334.    By reason of the foregoing, Fifth Third has sustained and continues to sustain damages.

335.     Plaintiffs, on behalf of Fifth Third, have no adequate remedy at law.

## COUNT VI

**(Against the Officer Defendants (Tuzun and Forrest) for Unjust Enrichment)**

336.     Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

337.     Through the wrongful course of conduct and actions complained of herein, the Officer Defendants were unjustly enriched at the expense of, and to the detriment to, Fifth Third. The wrongful conduct was continuous and resulted in ongoing harm to the Company.  The Officer Defendants were unjustly enriched pursuant to receiving compensation and officer remuneration.

338.     Plaintiffs, as shareholders of Fifth Third, seek restitution from the Officer Defendants, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by the Officer Defendants from their wrongful course of conduct and fiduciary breaches.

339.     By reason of the foregoing, Fifth Third has sustained and continues to sustain damages.

340.     Plaintiffs, on behalf of Fifth Third, have no adequate remedy at law.

## COUNT VII

**(Against Individual Defendants for Violations of Section 14(a) of the Exchange Act)**

341.     Plaintiffs incorporate by reference and reallege each of the foregoing allegations as though fully set forth herein.

342.     Plaintiffs bring this case of action derivatively on behalf of the Company.

343.     Each of the Individual Defendants authorized or oversaw the dissemination of at least one of Fifth Third's Proxy Statements (defined above as the 2018, 2019, and 2020 proxy statements).

344.    Rules 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

345.    The Proxy Statements issued by the Board violated §14(a) of the Exchange Act and Rule 14a-9 because the Proxy Statements contained false statements and omitted material facts necessary to make the discussion of the Company's business operations and internal controls not false and misleading.  Specifically, the Proxy Statements failed to disclose, *inter alia*, that: (i) the Board was on notice for years of the misconduct described herein; (ii) the Company's use of Cross-Selling and incentives caused its employees to engage in the misconduct described herein; (iii) the Company was aware of the misconduct as early as 2008 but neglected to design and monitor the Company's Cross-Selling and incentive compensation in a way that would identify and prevent the misconduct described herein; (iv) there were material weaknesses in the Company's internal controls; (v) the Company was at a heightened risk of regulatory action due to the misconduct described herein; and (vi) the Company's earnings were at least partially a result of the misconduct described herein and were not sustainable.

346.    Furthermore, the Proxy Statements were false and misleading by stating that the Company's compensation programs were tailored to avoid risks but instead the Individual Defendants encouraged and fostered a culture of unnecessary risk-taking while being on notice of the misconduct.  Specifically, despite the Proxy Statements claiming that the Company was focused on avoiding excessive risk, the Company implemented aggressive incentive compensation programs that encouraged risk-taking and rewarded employees for new accounts and the number

of accounts that current customers had with Fifth Third Bank. During this time, the Audit Committee was responsible for reviewing all employee complaints submitted through the EthicsLine. As a result, the Audit Committee and the entire Board were on notice of the misconduct described herein and failed to disclose this information.

347.    Further, the Proxy Statements issued by the Board were false and misleading as to the extent they contained information describing the Company's compliance with governmental policies and regulations. The Proxy Statements were further false and misleading as the Individual Defendants failed to comply with the Company's Code while representing that the application of its terms was nonnegotiable. Moreover, the Proxy Statements were false and misleading by not disclosing the misconduct discussed herein and the scheme to issue false and misleading statements and/or omit material facts necessary for shareholders to make informed decisions regarding the Company.

348.    By reason of their fiduciary duties and through the application of reasonable care, the Individual Defendants knew or should have known that by failing to disclose the material facts as discussed herein, the representations and statements made in the Proxy Statements were materially false and misleading. The misstatement or omission of material facts were vital information necessary for reasonable shareholders, including Plaintiffs, when voting on items contained within the Proxy Statements, including whether to support the election of Board members, approval of executive compensation, and selection of the Company's independent auditor.

349.    The false and misleading statements of the Proxy Statements caused and directly led to the re-election of Defendants Carmichael, Akins, Benitez, Blackburn, Brumback, Burris, Heminger, Hoover, Mallesch, McCallister, and Williams during the period of misconduct

described herein. Further, their re-election, based on false and misleading statements, permitted these Directors to continually abdicate their duties owed to Fifth Third, its shareholders, and Plaintiffs.

350. The Company was damaged as a direct and proximate result of the dissemination of the false and misleading Proxy Statements because the Proxy Statements contained material misrepresentations and omissions, as alleged herein, which wasted corporate assets and prevented shareholders from engaging in a fully informed vote for, among other things, whether to support the election of Board members, approval of executive compensation, and selection of the Company's independent auditor.

351. Plaintiffs, on behalf of Fifth Third, have no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

A. Determining that this action is a proper derivative action maintainable under the law and demand was excused;

B. Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C. Directing Fifth Third to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of

operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

       D.     Awarding to Fifth Third restitution from the Individual Defendants, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

       E.     Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

       F.     Granting such other and further relief as the Court deems just and proper.

Dated: August 7, 2020

                              Respectfully submitted,

                              By: */s/ Kyle A. Shamberg*

                              Kyle A. Shamberg
                              **Carlson Lynch LLP**
                              111 W. Washington Street, Suite 1240
                              Chicago, IL 60602
                              Telephone: (312) 750-1265
                              kshamberg@carlsonlynch.com

                              **FARUQI & FARUQI, LLP**
                              Nadeem Faruqi
                              Nina M. Varindani
                              685 Third Avenue, 26th Floor
                              New York, NY 10017
                              Telephone: (212) 983-9330
                              Facsimile: (212) 983-9331
                              nfaruqi@faruqilaw.com
                              nvarindani@faruqilaw.com

                              **FARUQI & FARUQI, LLP**
                              Alex B. Heller
                              Christopher M. Lash
                              1617 John F. Kennedy Blvd, #1550

One Penn Center
Philadelphia, PA 19103
Telephone: 215-277-5770
Facsimile:  215-277-5771
aheller@faruqilaw.com
clash@faruqilaw.com

*Attorneys for Plaintiffs William Cox
and Merrill Dill*